******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HEATHER SCHIMENTI *v.* MATTHEW SCHIMENTI
(AC 39175)

Lavine, Sheldon and Bishop, Js.

*Syllabus*

The defendant, whose marriage to the plaintiff previously had been dissolved, appealed to this court from the postjudgment orders of the trial court requiring him to pay one half of an initiation fee for the plaintiff's full membership into a certain country club and certain of her counsel fees. Pursuant to an agreement of the parties, which was incorporated into the modified judgment of dissolution, the defendant agreed to pay 50 percent of the plaintiff's initiation fee to the subject country club. The plaintiff subsequently filed a number of motions for contempt, including one concerning the defendant's alleged failure to comply with the country club initiation fee provision in the modified judgment. The plaintiff also sought counsel fees related to the prosecution of the motions. Following a hearing, the trial court, although not finding the defendant in contempt, determined that the phrase "initiation fee" in the modified judgment was ambiguous and that the plaintiff was entitled to a senior membership rather than a lower level of membership as the defendant had argued. The defendant did not, at any time, request that the court recuse itself or move for disqualification of the trial judge. On appeal, the defendant claimed, for the first time, that the trial court's orders were improperly based on the trial judge's admitted bias and prejudice arising out of her personal experience as a female golfer. *Held* that under the particular circumstances of this case, the trial court committed plain error in making the subject orders and a failure to reverse the judgment would result in manifest injustice to the defendant: the trial judge failed to act impartially and committed obvious error in issuing her orders, as the record clearly revealed that, in determining the level of membership to which the plaintiff was entitled, the judge, instead of ascertaining through a fact bound inquiry the intent of the parties in using the ambiguous phrase "initiation fee," ascribed a meaning to that phrase derived solely from her own perception of the subordinate role to which women golfers are relegated in country clubs, and, therefore, the trial judge, in reaching her decision, improperly relied exclusively on her own prejudices born of her life experiences, instead of well established law; accordingly, the trial court's orders concerning the initiation fee and for the payment of counsel fees could not stand.

Argued January 10—officially released April 24, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Danbury and tried to the court, *Winslow, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court; thereafter, the court, *Hon. George Levine*, judge trial referee, rendered a modified judgment in accordance with the parties' agreement and the appeal was withdrawn; subsequently, the court, *Winslow, J.*, granted in part the plaintiff's motion for contempt and issued certain orders; thereafter, the court, *Winslow, J.*, denied the defendant's motion to reargue, and the defendant appealed to this court; subsequently, the defendant filed an amended appeal with this court. *Reversed*; *further proceedings.*

*Jeffrey J. White*, with whom, on the brief, were *Kathleen E. Dion* and *Kelly Frye Barnett*, for the appel-

lant (defendant).

*Thomas M. Shanley*, for the appellee (plaintiff).

*Opinion*

BISHOP, J. In this postjudgment marital dissolution matter, the defendant, Matthew Schimenti, appeals from the trial court's orders requiring him to pay for one half of the initiation fee for a full membership into a country club for the plaintiff, Heather Schimenti, and certain of her counsel fees. On appeal, the defendant claims that the court's orders were improperly based on the trial judge's admitted bias and prejudice arising from her personal experience as a female golfer. He additionally claims that the court's order requiring him to pay the plaintiff's counsel fees constituted an abuse of discretion where the court made no finding of contempt on the basis of his challenged conduct and the plaintiff had ample financial means to pay her own counsel fees. We reverse the judgment of the trial court.

The underlying facts are uncontroverted. Following a trial before the court, *Winslow, J.*, the marriage of the parties was dissolved by a memorandum of decision dated November 18, 2014. As part of its judgment, the court entered various orders regarding custody, support, periodic and lump sum alimony, and property. Included in these orders was a provision that the defendant would "retain sole rights to the country club membership at Silver Spring Country Club." Shortly thereafter, on December 5, 2014, the defendant appealed to this court, outlining in his preliminary statement of issues numerous claims as to the trial court's financial orders.[1] In conjunction with the appeal, the parties participated in a preargument conference.[2] At the conference, the parties reached an agreement resolving all the issues on appeal. Accordingly, on May 21, 2015, their agreement was memorialized and entered by the court, *Hon. George Levine*, judge trial referee, as a modified judgment. The modified judgment included the following provision pertinent to the issues now before this court: "The following sentence shall be added to paragraph 38 [of the original judgment]: The defendant agrees to pay 50 percent of the plaintiff's initiation fee to Innis Arden Country Club."[3] Thereafter, upon the entering of the modified judgment, the appeal was withdrawn.

In spite of the parties' accord, disagreements between them continued unabated. By a pleading dated August 17, 2015, the plaintiff moved that the defendant be held in contempt for his alleged failure to comply with the life insurance provision of the dissolution judgment, as modified. Later, by a pleading dated October 6, 2015, the plaintiff moved that the defendant be held in contempt for not timely or fully paying his court-ordered child support. On October 13, 2015, the plaintiff moved that the defendant be held in contempt for his alleged failure to comply with the country club initiation fee provision in the modified judgment. The plaintiff also sought counsel fees in conjunction with the prosecution

of these postjudgment contempt motions. Finally, by a motion dated December 9, 2015, the plaintiff sought an order that the defendant be required to timely meet his obligation to make periodic payments to her in accordance with the terms of the judgment, as modified. That motion was subsequently marked "off."

These postjudgment matters first appeared on the short calendar docket on December 14, 2015. On that date, counsel and the court, *Winslow, J.*, engaged in a discussion regarding the nature of the pending motions with an eye toward having them heard on a later date. During this colloquy, the defendant's counsel stated his belief that the court would need to hear evidence concerning the defendant's intentions at the time he entered into the postjudgment country club initiation fee agreement. The court, however, disagreed, stating as follows that the plaintiff should be entitled to a membership level at the Innis Arden Country Club equal to that of the defendant at his own club: "Whatever it is, it's going to be the same for her."[4]

On February 8, 2016, the court conducted a hearing on the pending motions for contempt and for counsel fees.[5] Heard and decided by the court on that date were the following: the plaintiff's request for counsel fees in conjunction with her motion for contempt dated August 17, 2015, regarding life insurance;[6] the plaintiff's motion for contempt dated October 6, 2015, regarding child support and request for counsel fees in conjunction with that motion; and the plaintiff's motion for contempt dated October 13, 2015, alleging the defendant's failure to comply with the country club initiation fee provision in the modified judgment and a request for counsel fees in conjunction with that motion. Although not finding the defendant in contempt, the court ordered the defendant to pay one half of the $70,000 initiation fee for a senior membership at the Innis Arden Country Club and to contribute the sum of $5750 toward the plaintiff's counsel fees relating to the life insurance, child support, and country club initiation fee contempt motions. During the hearing, in response to the request of the defendant's counsel to introduce evidence of the plaintiff's golf history, the court stated: "Don't care what her golf history is, it's what her future is going to be."

Subsequently, the defendant filed a motion with the court to reargue and to reconsider its orders. The court conducted a hearing on April 18, 2016, but denied the motion to reargue. As part of its reasoning for the denial, the court stated: "I don't think it was because I had a misapprehension of facts. I think it was because I took what facts were presented and applied my prejudices, and every judge has—has life history, and life experience that comes out, perhaps, in the way that we rule on certain things. And you happened to have hit a nerve on this one." This appeal followed.

We are mindful that the defendant did not, at any

time, ask the court to recuse itself or move for disqualification of the judge. Thus, the defendant's claim of judicial bias is raised for the first time on appeal.[7] At the outset, we acknowledge that ordinarily a reviewing court will not entertain an issue raised for the first time on appeal. *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619, 99 A.3d 1079 (2014). We also are mindful that although this court may review an unpreserved claim of judicial bias for plain error, not every claim of partiality warrants reversal on the basis of plain error. See, e.g., *State* v. *D'Antonio*, 274 Conn. 658, 690–91, 877 A.2d 696 (2005) (although it was improper for trial court to sentence defendant after actively participating in negotiations, court's conduct did not rise to level of bias or implicate integrity of process). Nevertheless, under the present circumstances, we find it necessary to review the defendant's claim of judicial bias under our doctrine of plain error. See *Cameron* v. *Cameron*, 187 Conn. 163, 168, 444 A.2d 915 (1982) (Supreme Court reviewed unpreserved claim of judicial bias under plain error because it "implicates basic concepts of fair trial").

"[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error,

the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *Reville* v. *Reville*, 312 Conn. 428, 467–69, 93 A.3d 1076 (2014). Indeed, our jurisprudence mandates reversal when the reviewing court determines that manifest injustice has resulted from the trial court's unpreserved error. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 150, 84 A.3d 840 (2014).[8]

"[O]ur Supreme Court has recognized that a claim of judicial bias strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary. . . . No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest degree of impartiality. If [the judge] departs from the standard, he [or she] casts serious reflection upon the system of which [the judge] is a part. . . . We review this [unpreserved] claim [of partiality] therefore . . . under a plain error standard of review." (Internal quotation marks omitted.) *State* v. *Carlos C.*, 165 Conn. App. 195, 206–207, 138 A.3d 1090, cert. denied, 322 Conn. 906, 140 A.3d 977 (2016).

The teaching of decisional law is that, although plain error review is not automatically accorded to every claim of judicial bias, such a claim bears close scrutiny because it touches upon a judge's impartiality, a core ingredient of a fair judicial process. "In reviewing a claim of judicial bias, this court employs a plain error standard of review. . . . The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Internal quotation marks omitted.) Id., 207.

It is axiomatic that in any judicial proceeding in a rule of law system, the disputants are entitled to have their issues heard and decided by an impartial arbiter. This requirement not only benefits the litigants, but it is an essential condition to public confidence in the judiciary. "Of all the charges that might be leveled

against one sworn to 'administer justice' and to 'faithfully and impartially discharge and perform all the duties incumbent upon me,' . . . a charge of bias must be deemed at or near the very top in seriousness, for bias kills the very soul of judging—fairness." (Citation omitted.) *Pac-Tec, Inc.* v. *Amerace Corp.*, 903 F.2d 796, 802 (Fed. Cir. 1990), cert. denied sub nom. *Perry* v. *Amerace Corp.*, 502 U.S. 808, 112 S. Ct. 49, 116 L. Ed. 2d 27 (1991).

In assessing a claim of judicial bias, we are mindful that adverse rulings, alone, provide an insufficient basis for finding bias even when those rulings may be erroneous. *Massey* v. *Branford*, 118 Conn. App. 491, 502, 985 A.2d 335 (2009), cert. denied, 295 Conn. 913, 990 A.2d 345 (2010); see also 46 Am. Jur. 2d 267, Judges § 141 (2017). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphasis in original.) *Liteky* v. *United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).

Before we reach the principal issue on appeal, we discuss, generally, the task of a court when confronted with the language of a marital dissolution judgment based on an agreement of the parties.[9] "If the language of a contract is clear and unambiguous, the intent of the parties is a question of law, subject to plenary review." *Eckert* v. *Eckert*, 285 Conn. 687, 692, 941 A.2d 301 (2008). Conversely, if the language of an agreement is not clear and is ambiguous, the court's responsibility is to ascertain the intent of the parties in using the language under review. In such a situation, it is always appropriate and likely necessary for the court to consider extrinsic evidence of the parties' intent in employing the language under scrutiny. See *Hare* v. *McClellan*, 234 Conn. 581, 597, 662 A.2d 1242 (1995) ("extrinsic evidence is always admissible to explain an ambiguity appearing in the instrument" [internal quotation marks omitted]); see also *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, 239 Conn. 769, 780–81, 687 A.2d 1270 (1997) ("if the meaning of the language contained in [an instrument] is not clear, the trial court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity").

These general rules of contract interpretation pertain to marital dissolution agreements. "It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. . . . When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Isham* v. *Isham*, 292 Conn. 170, 180–81, 972 A.2d 228 (2009).

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . *If the language of a contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.*" (Emphasis added; internal quotation marks omitted.) *Gabriel* v. *Gabriel*, 324 Conn. 324, 341–42, 152 A.3d 1230 (2017).

Applying this general overlay to the facts of the present case, the threshold task confronting the court in this instance was to determine whether the phrase "initiation fee," as used by the parties in the modified judgment, was clear and unambiguous. On the basis of representations by counsel, the Innis Arden Country Club offers three levels of membership, with an initiation fee of $70,000 for a senior membership, $38,000 for an associate membership, and $5000 for a house membership. The court opined that it suspected that "neither party anticipated the problem" as to the level

of the plaintiff's membership in their agreement, or thus in the modified judgment, and that the judgment "is vague, and needs to be defined." We agree with this legal determination. Because the phrase "initiation fee" in the modified judgment could have referred to any one of three available levels of membership in the Innis Arden Country Club, each with its distinct initiation fee, that phrase, as used in the modified judgment, was ambiguous.

Once the court made this correct determination, its task became to ascertain, through a fact bound inquiry, the intent of the parties in using the subject language in their postjudgment agreement. Rather than doing so, however, the court took a different tack. Instead of attempting to ascertain the intent of the parties, the court read its own outcome preference into the disputed language. In doing so, the trial judge explicitly based her ruling on her personal experiences and resulting prejudices instead of seeking to determine the parties' intent in utilizing the language in question. In other words, the court did not undertake the fact bound task of discerning the parties' intent but, instead, ascribed a meaning to the phrase "initiation fee" derived solely from its own perception of the historically unfair treatment of women golfers in country clubs.[10]

During the hearings on the motions under review, although the trial judge made clear her intent to base the order regarding the country club initiation fee on her own experiences and prejudices, and not the parties' intent, the defendant at no time sought the court's recusal; nor did the defendant bring to the judge's attention any concerns he may have had regarding her impartiality. Rather, we reiterate, he raises the issue of judicial bias for the first time on appeal.

"[A]n appellate court may reach an unpreserved issue sua sponte, pursuant to the plain error doctrine, if: (1) the parties have had a chance to brief the issue; (2) further factual findings are not needed to resolve the issue; (3) the answer to the issue is so obvious as to be not debatable; and (4) leaving the judgment intact would work a manifest injustice." *Matos* v. *Ortiz*, 166 Conn. App. 775, 790, 144 A.3d 425 (2016). We determine that these requirements have all been met.

As discussed previously in this opinion, the parties filed supplemental briefs on the issue of whether this court should accord plain error review. The record clearly reveals that the trial judge repeatedly stated her perception of the subordinate role to which women are relegated in country clubs and, borrowing from her personal experience, determined that the plaintiff should be entitled to precisely the same level of membership in her country club as the defendant enjoyed in his. The court telegraphed this inclination at the December 14, 2015 hearing on this matter and later simply confirmed this view based, not on evidence of

the parties' intent in utilizing the language in question, but on the court's stated unfavorable experiences as a woman golfer. Thus, the court not only acted in a partial manner, but it also made plain its biased and prejudiced pathway to making its decision. This impropriety was clear, obvious, and indisputable.

In response, the plaintiff correctly argues that a trial judge need not leave insights and common sense derived from her life's experience at the courthouse door. We do not disagree.[11] Nevertheless, attitudes garnered from personal life experience cannot serve as a substitute for properly admitted evidence at a hearing where the court's mandate is to ascertain the intent of the parties. "Judicial impartiality is the hallmark of the American system of justice." 48A C.J.S., Judges § 247 (2018). The background and experience of a trial judge are disqualifying only if they prevent that judge from assessing the evidence fairly and impartially. "It is assumed that judges, regardless of their personal backgrounds and experiences in life, will be able to set aside any biases or predispositions they might have and consider each case in light of the evidence presented." *People* v. *Tye*, 141 Ill. 2d 1, 25, 565 N.E.2d 931 (1990), cert. denied, 502 U.S. 833, 112 S. Ct. 112, 116 L. Ed. 2d 81 (1991). In the present case, however, the trial judge's responsibility did not allow her to borrow from her life experiences extrinsic to the law. As the record plainly reflects, the trial judge did not follow her prescribed decision-making pathway but, instead, relied exclusively on her own prejudices born of her life experiences. The court's proper focus should have been on the well established decisional pathway for determining the intent of parties who use ambiguous language in a contract, requiring it to determine the meaning of that language.

"[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of [a] particular case." (Citation omitted; internal quotation marks omitted.) *Bracy* v. *Gramley*, 520 U.S. 899, 904–905, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). In sum, the responsibility of the court in hearing a disputed matter is to act with impartiality. This requirement entails not only being impartial but also acting in a manner that projects impartiality. Because neither occurred in this case, the judgment cannot stand as to either the court's order concerning the country club initiation fee or as to its order for the payment of counsel fees.[12] Reversal under the plain error doctrine requires "the existence of [an] error so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Reville* v. *Reville*, supra, 312 Conn. 468. We conclude that under the particular circumstances of the present case, not reversing the judgment would result in manifest injustice to the

defendant.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

[1] That appeal was docketed as AC 37462.

[2] A preargument conference is a mandatory settlement meeting held in conjunction with a pending appeal and hosted by a judge or judge trial referee. Its purpose, generally, is to explore the possibility of resolving the issues on appeal without the added expense and time of further pursuing an appeal. It is generally scheduled before briefs have been written and before oral argument in order to offer parties the possibility of an expeditious and relatively economical path to resolution by agreement. See Practice Book § 63-10.

[3] We note that the proper name of the club is the to Innis Arden Golf Club, Inc., but because the modified judgment, the parties, and the trial judge referred to it as the Innis Arden Country Club, we do so as well for consistency.

[4] In explaining the nature of the agreement regarding payment of the plaintiff's initiation fee at the Innis Arden Country Club, the defendant's counsel, Attorney Daniel Kennedy, stated: "We have a disagreement over what level of membership. She applied for the top level of full golf privileges, when it was my client's understanding [that] she'd be applying for, what they refer to as, 'house,' but a social membership with some limited playing privileges."

Later, in the same colloquy, the following exchange took place when the plaintiff's counsel indicated that he had not been aware of this issue:

"[The Defendant's Counsel]: There was correspondence, on October 6, indicating that my client was more than willing to immediately pay half the amount of the money for the membership level that he anticipated [the plaintiff was] applying for. That was—

"The Court: All right.

"[The Defendant's Counsel]: —I believe, a day after—

"The Court: I mean, I can give you—

"[The Defendant's Counsel]: —the motion was filed.

"The Court: —a quick answer on this. Do you want it? . . . What's the level of his ownership—of his membership at his club?

"[The Plaintiff's Counsel]: Right. And—that's what I'm saying. It's a simple—

"The Court: Whatever it is, it's going to be the same for her.

* * *

"The Court: Why wouldn't it be the same as his membership?

"[The Defendant's Counsel]: Because she's not—he's an active, couple of days a week golfer. She has never been. He never anticipated—and we're going to need testimony on that. He never anticipated that she was going to apply for—

"The Court: And take up golf.

"[The Defendant's Counsel]: —the full soup to nuts membership.

* * *

"The Court: All right. Well, I mean, I'll give you a heads up on it. I'm gonna—I'm going to rule, if it's left to me, but maybe you should take it back to Judge Levine.

"[The Plaintiff's Counsel]: I don't think there's any need to do that, number one. The other motion—

"[The Defendant's Counsel]: I disagree.

"[The Plaintiff's Counsel]: —is simply that—

"[The Defendant's Counsel]: I disagree with him.

"The Court: Okay."

Following discussion on another unrelated motion, the parties and the court agreed to continue the matter to February 1, 2016. In closing, the court indicated it would hear all the pending motions and evidence on the plaintiff's contempt motion. As to the motion regarding the country club initiation fee, the court commented:

"The Court: All right. Mr. Kennedy, you got a hint on that first one?

"[The Defendant's Counsel]: Loud and clear.

"The Court: Okay."

[5] The court marked "off" the plaintiff's December 9, 2015 motion for an order because although the motion alleged that the defendant was not making his periodic payments in a timely manner, the motion sought only

an order that the defendant comply with the terms of the judgment in this regard. Because it did not ask that the defendant be found in contempt, the court correctly discerned that it would be superfluous for the court to order the defendant to do what the judgment already required him to do.

[6] During the hearing, the plaintiff's counsel represented that the life insurance issue was complied with after the motion was filed. Nevertheless, the plaintiff requested counsel fees in conjunction with the filing of that motion.

[7] We note that the defendant did not, in his appellate brief or during oral argument, explicitly request plain error review of his claim of judicial bias. Following oral argument, this court ordered the parties to submit supplemental briefs to address the question of whether we should, sua sponte, accord plain error review to the defendant's unpreserved claim of judicial bias. In response, both parties submitted briefs for this court's review. In his supplemental brief, the defendant raises the argument we should review his claim of judicial bias under our plain error doctrine. In her supplemental brief, the plaintiff contends that the defendant cannot prevail under the plain error doctrine.

[8] Specifically, our Supreme Court has stated that "we can perceive no reason why a reviewing court should be precluded from raising issues involving plain error or constitutional error sua sponte, as long as the court provides an opportunity for the parties to be heard by way of supplemental briefing and the other threshold conditions for review are satisfied." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161–62. From this review of decisional law, it is apparent that a party who seeks plain error review and who adequately briefs such a claim will, indeed, obtain a review of that claim on appeal. That party, however, will obtain a reversal only if the reviewing court finds plain error.

[9] As noted previously in this opinion, although the original judgment of marital dissolution stemmed from a trial, the modified judgment resulted from the parties' postjudgment agreement.

[10] Indeed, the court did not mask its approach or its outcome preferences based on its own experiences. At the outset of the hearing on February 8, 2016, the court observed: "Working our way backwards, we had some discussion about this country club business the last time we were in court. We didn't have a hearing, but I understood what the positions were on each side. And I dropped a very heavy hint as to where the court could be coming from." See footnote 4 of this opinion.

Further on, the following exchange occurred:

"The Court: "[A]ll this discussion last time we were in court and I said she's entitled to the same form of membership that her husband has at the country club he belonged to. Her former husband. You [don't] remember my saying that?

"[The Defendant's Counsel]: I did. But I didn't know at the time . . . what the associate membership provided her with. And I did some digging pursuant to the subpoena—

"The Court: Well, you told me. It was essentially the same as what a social membership would be, pool privileges, restaurant and so forth—

"[The Defendant's Counsel]: She still ha[s]—

"The Court: —but excluding golf.

"[The Defendant's Counsel]: That's not my understanding now is what I'm saying.

"The Court: Ah. What is it?

"[The Defendant's Counsel]: My understanding speaking to Innis Arden, we can certainly bring them here if need be, is that the associate membership still has golf associated but not full golf privileges—

"[The Plaintiff's Counsel]: That's the difference.

"[The Defendant's Counsel]: —but enough. And we looked at—

"The Court: And you're saying that to a female—

"[The Plaintiff's Counsel]: Right.

"The Court: —who's had to put up with golf, having to get different times because the men always get Saturday and Sunday mornings?

"[The Defendant's Counsel]: No. Well, there's an equal number of men who are associate members as well. This isn't a gender thing, Your Honor.

"The Court: Oh, it is so. Don't be ridiculous, Mr. Kennedy.

                              * * *

"The Court: You take your judges as you find them and unfortunately—

"[The Defendant's Counsel]: Well, I—Respectfully, Your Honor, I don't think that the associate in 2016 at Innis Arden is meant to be discriminatory . . . . I looked up—

"The Court: You're 100 percent wrong, Mr. Kennedy.

"[The Defendant's Counsel]: Okay. I will—

"The Court: This is [a] grandfathering issue. Country clubs are male dominated, they are—set up their golf privileges for the purposes of allowing the men to play and not be bothered with having to deal with those females who are on the course at the same time.

"[The Defendant's Counsel]: If I could, Your Honor, well, I think the issue here is what the parties agreed to. And if you look at—I printed out [the plaintiff's] golf history, 2015—

"The Court: Don't care what her golf history is, it's what her future is going to be.

"[The Defendant's Counsel]: I've given you my . . . argument.

"The Court: I mean now this is—I told you last time what this was going to be. She's going to be entitled to the same level of membership that her husband enjoys at his club. And if that is a full number one golf membership, that's what she's going to get too."

After additional colloquy between the parties regarding the sales tax related to the country club initiation fee, the court further stated: "Your party agreed to it, Mr. Kennedy, and the motion is granted insofar as it requests that the level of membership needs to be the same as that which is enjoyed by [the defendant] at his club."

The court conducted another hearing on this topic on April 18, 2016, in response to the defendant's motion to reargue the court's ruling that the defendant pay the highest level of initiation fee at the Innis Arden Country Club. At this hearing, once again, the court fully and firmly stated its view of the role and status of women in country clubs. At this hearing, the defendant expressly sought the opportunity to present evidence regarding his intent when he signed the agreement. The transcript reflects the following:

"[The Defendant's Counsel]: Well, we did try to introduce evidence as [to] . . . the number of rounds [the plaintiff] played of golf, in the last four or five years. Which would fall within that asso—

"The Court: I didn't think she played any. She played a few?

"[The Defendant's Counsel]: I believe—I don't have it in front of me, again, but she entered into the GHIN system between one and five rounds per year, the last couple years. And that level of play would fit into this associate membership in Innis Arden. It does allow golf, just doesn't allow golf any day of the week, at any time you want it.

"The Court: Right. It's always difficult when you have a judge who has prejudices.

"[The Defendant's Counsel]: It's a golf day today, by the way, Your Honor?

"The Court: Well, my golf days are on Tuesdays. But in my very limited experience with a country club, which I left because of the surcharge I was having to pay in order to play on the mornings on the weekends, which really frosted me, if I may say so. Because there are some built-in prejudices with country clubs, and their historical makeup, and the way they treat golf. And so, you sort of deal with some of those problems, when you have a judge that feels rather strongly about the access that males and females should have to the golf course.

"I don't think that it's going to be productive to take more evidence from what I already heard, [be]cause you made the same statement to [me] before. I mean, I already was aware that there was a claim that [the plaintiff] had had very limited golfing, in the recent years. In fact, I thought it was virtually, nothing. But I guess, maybe from a golfer's point of view, what you just said is virtually nothing, too. But what I heard was . . . [that] even if she hadn't been doing it, she was going to take it, or wanted the option of taking it up.

"So, it was not from any lack of factual evidence. I mean, if you feel to make a further record that you want [the defendant] to testify as to what you just said, I guess you could do so. . . . I had that information, and maybe it wasn't taken from formal testimony. Maybe it was from argument. I presumed it to be correct when I interpreted the judgment.

"[The Defendant's Counsel]: Okay.

"The Court: I don't think it was because I had a misapprehension of facts. I think it was because I took what facts were presented and applied my prejudices, and every judge has—has life history, and life experience that comes out, perhaps, in the way that we rule on certain things. And you happened to have hit a nerve on this one.

"[The Defendant's Counsel]: Understood. I do have one other motion, Your Honor. I take it that's denied?

"The Court: Well, I'm not going to allow further evidence. So, I guess I

should just—the easiest way to deal with it is to deny it, yeah."

[11] We do not dispute the principles that "[e]ach judge brings to the bench the experiences of life, both personal and professional. A lifetime of experience that has generated a number of general attitudes cannot be left in chambers when a judge takes the bench. Thus, a judge's average personal experiences do not generally lead to reasonable questions about the judge's impartiality and subsequent disqualification." (Footnotes omitted.) 46 Am. Jur. 2d, supra, § 139, p. 265.

Nevertheless, a judge is also "a minister of justice" and "should be careful to refrain from any statement or attitude which would tend to deny [a party] a fair trial. . . . It is his [or her] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted.) *In re Nathan B.*, 116 Conn. App. 521, 525, 977 A.2d 224 (2009); accord *Cameron* v. *Cameron*, supra, 187 Conn. 168–69.

[12] On review, we cannot parse the court's bias to determine that it infected only its order regarding the country club initiation fee. Nor do we know from the record the portion of the counsel fees ordered that pertained to the country club initiation fee dispute and the portion that may have related to other pending motions. Additionally, because we resolve this matter on the basis stated, we do not reach the question of whether the court properly could have ordered the defendant to pay counsel fees to the plaintiff where he was not held in contempt and where she had adequate funds to pay her own counsel fees.

———————————————