******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DESSA, LLC *v.* PETER RIDDLE ET AL.
(AC 45072)

Cradle, Suarez and Flynn, Js.

*Syllabus*

The defendant J appealed to this court from the judgment of the trial court, which found that J and his father, P, were jointly and severally liable for unpaid rent and other expenses in connection with the plaintiff landlord's lease of an apartment to P. J testified at trial that he had never resided at the apartment and had never seen or known of the lease until he was served with process when the plaintiff commenced suit. P testified that, after the plaintiff had informed him that his credit was insufficient to rent the apartment, he used J's Social Security number and identity to acquire the lease, told the plaintiff that J would also be a tenant at the apartment and forged J's signature on the lease and placed utilities in J's name, all without J's knowledge. The court, *Spader, J.*, found that, although P and J were "largely credible," it also stated that it did not believe J had known nothing about P's actions and credit issues. Judge Spader stated that, "[s]peaking personally, as a son," he would have let his father use his name and credit in similar circumstances, and that, even if J had not given explicit permission to P, "as a dutiful son," permission to do so was implied. *Held*:

1. This court was unpersuaded by J's claim that newly discovered evidence demonstrated that the plaintiff had commenced this action with unclean hands and without probable cause under fraudulent premises: J's failure to raise those issues at the time of trial or by way of an appropriate posttrial motion undermined his ability to raise those issues on appeal; moreover, whether the plaintiff's conduct amounted to the misconduct J had alleged was an issue of fact that had to be decided by the trial court in the first instance, and, even if the court had found that wilful misconduct on the part of the plaintiff had been proven, the issue of an appropriate sanction had to be determined in the trial court's sound discretion and was not an issue for this court to decide in the first instance.

2. This court concluded that the trial judge's statements that he would have permitted his father to use his name and credit in similar circumstances and that doing so was the obligation of a dutiful son left it with the definite and firm conviction that a mistake had been committed: the trial judge appeared to have relied on those beliefs, rather than on the evidence, in finding that J had guaranteed the debt P incurred with respect to the lease; moreover, regardless of whether there was a rational view of the evidence that might have supported the court's findings of fact, the court's decision was difficult to reconcile in key respects, as the finding that P and J were largely credible was difficult to reconcile with the court's determination that it was "hard to believe" J's testimony as to whether he was aware that he was guaranteeing P's debts; furthermore, because the court concluded that J acted both explicitly and implicitly, it was unclear what legal theory the court relied on to impose joint and several liability; accordingly, because the court's decision was apparently based in part on improper considerations, the judgment was reversed and the case was remanded for a new trial.

Argued September 20, 2023—officially released January 23, 2024

*Procedural History*

Action to collect unpaid rent, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, Housing Session at Norwalk; where the court, *Spader, J.*, denied the motion to dismiss filed by the defendant Jonathan Riddle; thereafter, the case was tried to the court; judgment for the plaintiff, from which the defendant Jonathan Riddle appealed to this court. *Reversed; new trial.*

*Jonathan Riddle*, self-represented, the appellant (defendant).

*Thomas C. C. Sargent*, for the appellee (plaintiff).

*Opinion*

SUAREZ, J. The plaintiff landlord, Dessa, LLC, commenced the underlying action against the defendants, Peter Riddle (Peter) and his son, Jonathan Riddle (Jonathan), to collect unpaid rent pursuant to a written lease agreement that was allegedly entered into between the parties.[1] Jonathan appeals from the judgment of the trial court finding the defendants jointly and severally liable for damages in the amount of $11,113.06. Jonathan claims that (1) newly discovered evidence demonstrates that the plaintiff interfered with the court's ability to be impartial and equitable in this case, and (2) the court's findings are clearly erroneous. We reverse the judgment of the trial court.

In its two count complaint, the plaintiff alleged that it owned and leased the subject property in Stamford and that, on September 4, 2016, the defendants signed a written lease agreement requiring them to pay $2350 in rent each month, with a $150 late fee if not paid in full by the tenth of each month. The plaintiff alleged that the defendants failed to pay rent from April through August, 2017, and from September 1 through 15, 2017, leading to an arrearage of $12,925 in unpaid rent and $900 in late fees. Additionally, the plaintiff alleged that the written lease agreement required the defendants to pay utility bills, $538.06 of which were unpaid. The plaintiff further alleged that the defendants were jointly and severally liable for damages in the amount of $14,363.06. The plaintiff sought the damages alleged, attorney's fees as permitted under the terms of the lease agreement, and any other form of relief that the court may find just and proper.

In his answer, Peter agreed that he had entered into the written lease agreement but disagreed that he failed to pay any moneys due under the lease. In his answer, Jonathan disagreed with every allegation in the plaintiff's complaint.

A bench trial was held on May 20, 2021, by means of a remote hearing, before the court, *Spader, J.* The court heard testimony from Janine Cloutier, the sole member of the plaintiff limited liability company, as well as both defendants. In an order dated May 23, 2021, the court set forth its decision: "On the surface, this is a straightforward collections matter. [Peter] took possession of the plaintiff's premises located at 35 West Broad Street #205 in Stamford . . . pursuant to a lease dated September 4, 2016. [Peter], with his daughter, Jessica [Riddle], resided in the premises from October 1, 2016, through mid-September, 2017. Monthly rent was $2350. The defendants were late on [their] payments and do not contest the bulk of the debt due to the plaintiff . . . .

"The issue in the case is that the second defendant, [Jonathan] is also on the lease, and the plaintiff claims he is jointly and severally liable for the debt due to it.

"Following the denial of [Jonathan's] motion to dismiss, this matter went to trial remotely . . . on May 20, 2021. The court heard from the parties and found them largely credible. The plaintiff advised [the defendants] that [Peter's] credit was insufficient to make [the plaintiff] consider renting the apartment to him. He was, and is, in debt to the [United States Internal Revenue Service] as well as other creditors. The plaintiff required additional security guaranteeing payment of monthly rent before renting to him. Peter alleges [that], at that point, he used his son's Social Security number to essentially steal his son's financial identity to acquire the lease. He provided the plaintiff with an electronic transfer of his son's Experian credit report and advised [the plaintiff that] his son would also be a tenant. When the lease was drawn up, including Jonathan's name, Peter forged his son's signature on the lease.

"The plaintiff's concerns with Peter ended up being well founded when Peter defaulted on his rental obligations.

"The plaintiff commenced this action for payment of past due amounts against both Peter and Jonathan. Jonathan alleged [that he had] no knowledge that his name was used to obtain the apartment. He alleges that he never resided there and never saw the lease or knew of its existence until being served with this action. Peter admits the debts due herein and admits to fraudulently inducing the plaintiff to rent to him with his forgery and theft of his son's financial identity. If judgment enters, Peter believes it should only be as to him, personally, based on his admitted dishonesty involving his son.

"The plaintiff's manager admits she never saw Jonathan at the unit, nor provided him with keys but indicates [that the plaintiff] . . . would not have rented the apartment to the Riddles without Jonathan being liable on the rental payments. She advised the court that at least one [limited liability company] operated by the Riddles indicated this property address as Jonathan's residence and indicated that the electric bills were also in Jonathan's name. The [limited liability company] issue is not relevant; although Jonathan's residence is listed as this address, he never resided there, his sister was the secretary [for the limited liability company], and she completed the [limited liability company's] paperwork using this address. The testimony of the parties regarding the interconnectivity of the [family's] business affairs, however, makes it difficult for the court to believe Jonathan knew nothing of his father's credit issues and his involvement with their obtaining this premises.

"Peter advised that he was also unable to obtain credit to open utility accounts, so he also defrauded those creditors by placing utilities in Jonathan's name.

"As the court noted [previously], at trial, the parties were largely credible. Peter wouldn't call his actions 'fraud,' but he admitted to misusing his son's Social Security number and placing debts in his son's name. Jonathan was also credible; however, the court does not believe that he had no knowledge of his father's actions. Speaking personally, as a son, the undersigned would have allowed my father to use my name and credit if he was in a position where he had to. The defendants 'knew what they were doing,' as they needed to obtain an apartment, and [Peter] was not creditworthy. It doesn't matter that Jonathan did not occupy the premises; he was on the lease, and if there was not explicit permission from Jonathan for him to do so, as a dutiful son, the permission was implied. The defendants just did not expect this matter to get to the point where the plaintiff would pursue them in court for their nonpayment.

"When coupled with the utilities also being in Jonathan's name, it is hard to believe that Jonathan was not aware that he was guaranteeing Peter's debts. Jonathan can seek legal remedies against his father criminally or civilly if he truly believes his father acted without his consent. He has not done so since 'learning' of his [signature] being included on the lease when this action was commenced last year.

"The court finds that both of the defendants, Peter AND Jonathan . . . are jointly and severally liable for the debt due to the plaintiff. ([Jonathan's sister, Jessica] would also be responsible were she made a party.) The court finds that the surrender of the premises was not until at least September 15, 2017, as the access keys/ fobs were not fully returned to the plaintiff until at least that date. The court is not allowing late fees that were requested by the plaintiff for reasons stated on the record. The court finds for the plaintiff in the amount of $11,113.06, detailed as follows:

"Unpaid back rent: $12,925

"Unpaid water/sewer/utilities: $538.06

"Less: Security deposit balance: $2350

"Legal fees are awarded in the amount incurred to date of $1350. This amount is less than 15 percent of the debt pursuant to General Statutes § 47a-4 and [is] allowed under paragraph 16 of the lease.

"The plaintiff can submit a bill of costs to request an award of costs.

"The court awards judgment interest at 10 percent."

This appeal followed.

I

Jonathan first claims that newly discovered evidence demonstrates that the plaintiff interfered with the

court's ability to be impartial and equitable in this case.[2] He argues that "[n]ewly discovered evidence establishes [that] the plaintiff commenced this action with unclean hands [and] without probable cause under fraudulent premises." Although Jonathan's claim is not framed with legal precision, Jonathan appears to argue that this court should either sanction the plaintiff for having wilfuly abused the judicial process or rely on the doctrine of unclean hands to dismiss the plaintiff's action or preclude the plaintiff from recovering damages. We are not persuaded by this claim.

Jonathan essentially asks this court to find that the plaintiff engaged in a wide range of actions, including engaging in fraud, "maliciously" misrepresenting facts, fabricating evidence, testifying falsely, and showing a reckless disregard for the truth that undermined the trial court's ability to fairly adjudicate the case. Jonathan, however, is unable to demonstrate that the factual or legal issues he raises on appeal, in connection with this claim, were either raised before or ruled on by the trial court. "It is well known that this court is not bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. Practice Book § 60-5. The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the precise matter on which its decision is being asked. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court . . . to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Emphasis omitted; internal quotation marks omitted.) *Ochoa* v. *Behling*, 221 Conn. App. 45, 50–51, 299 A.3d 1275 (2023).

Jonathan's failure to have raised these issues either at the time of trial or by way of an appropriate posttrial motion undermines his ability to raise these issues in the present appeal. This is because the issues of whether the plaintiff, through its sole member, Cloutier, acted in a fraudulent manner in connection with the present litigation or acted wilfuly to abuse the judicial process in connection with the underlying action are not only related to what Cloutier's actions were but depend on a finding concerning her state of mind.[3] Whether the plaintiff's conduct amounts to the misconduct Jonathan alleges is an issue of fact that, in the first instance, must be decided by the trier of fact, not an appellate tribunal. It is axiomatic that "[an appellate] court does not try issues of fact or pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Wasniewski* v. *Quick & Reilly, Inc.*, 292 Conn. 98, 103, 971 A.2d 8 (2009). Moreover, even if the court had found that wilful misconduct on the part of the plaintiff had been proven, the issue of an appropriate sanction is left to the sound discretion of the trial court; it is not an issue to be decided in the first instance by this court.

For similar reasons, Jonathan's reliance on the doctrine of unclean hands, for the first time in this appeal, does not fare any better. "Our jurisprudence has recognized that those seeking equitable redress in our courts must come with clean hands. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied . . . for the advancement of right and justice. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Citation omitted; internal quotation marks omitted.) *Ridgefield* v. *Eppoliti Realty Co.*, 71 Conn. App. 321, 334–35, 801 A.2d 902, cert. denied, 261 Conn. 933, 806 A.2d 1070 (2002).

Our Supreme Court has stated that "[a]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court. *A & B Auto Salvage, Inc.* v. *Zoning Board of Appeals*, 189 Conn. 573, 578, 456 A.2d 1187 (1983); accord *Cohen* v. *Cohen*, 182 Conn. 193, 196, 438 A.2d 55 (1980) ([i]t is clear that [the doctrine of unclean hands] is to be applied . . . by the court in the exercise of its sound discretion); *DeCecco* v. *Beach*, 174 Conn. 29, 35, 381 A.2d 543 (1977) ([t]he maxim should be applied in the trial court's discretion). The exercise of [such] equitable authority . . . is subject only to limited review on appeal. . . . *The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion.*" (Emphasis added; internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 308, 777 A.2d 670 (2001).

For the foregoing reasons, we are not persuaded by Jonathan's first claim.

## II

Next, Jonathan essentially challenges the court's findings as being clearly erroneous. Jonathan argues that the court "ignored relevant factors" and "considered irrelevant factors" in resolving the factual issues before it. We agree with Jonathan.

Jonathan challenges the court's decision on several grounds. First, he argues that the evidence contradicted the court's findings. He relies on his testimony that he did not authorize his father to use his credit history to enter into the lease agreement, that he had not seen

the lease agreement until the plaintiff commenced the present action, and that he did not sign the lease agreement. Jonathan testified that he "had no understanding that [he] was connected to this address in any way legally or credit wise." Jonathan also relies on Peter's testimony that Peter had used Jonathan's credit history in order to enter into the lease agreement and had forged Jonathan's signature on the lease agreement without his knowledge.

Second, Jonathan argues that the court erroneously found that the address of the subject property was his residence rather than the address of a limited liability company owned by Jonathan, Peter, and Jessica.

Third, Jonathan argues that Judge Spader's findings were impacted by the judge's own personally held inclination to let his father use his name and credit, which Jonathan characterizes as a personal bias that "is legally incorrect and would establish an entirely new and erroneous, generalized legal principle as it pertains to sons of fathers." Specifically, Jonathan refers to the portion of the court's decision in which Judge Spader stated that he "would have allowed [his] father to use [his] name and credit if he was in a position where he had to" and that "if there was not explicit permission from Jonathan for [Peter] to [use his name and credit], as a dutiful son, the permission was implied." Jonathan argues that the court "is asserting that all sons, no matter the relationship to the father or circumstances, would allow the father to use their name and credit no matter the consequences, with or without consent." Jonathan also argues that it was improper for the court to have based its findings on the fact that he had not pursued any legal remedies against Peter for having used his name and credit without his knowledge or permission.

Finally, Jonathan argues that the court's factual findings cannot be reconciled. Noting that he testified at trial that he lacked any knowledge of Peter's fraudulent conduct until after the plaintiff commenced the underlying action, Jonathan argues that the court's initial finding that his testimony was "largely credible" cannot be reconciled with its subsequent finding that he and Peter " 'knew what they were doing' " in terms of using Jonathan's credit and identity to enter into the lease agreement.

"Our review is limited to a determination of whether the decision made is logically consistent and supported by the evidence." *Capmar Construction, Inc.* v. *Coyle*, 4 Conn. App. 579, 580, 495 A.2d 1115 (1985). "[W]here the factual basis of the [trial] court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . A finding of fact is clearly erroneous

when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *Circulent, Inc.* v. *Hatch & Bailey Co.*, 217 Conn. App. 622, 629–30, 289 A.3d 609 (2023).

At the outset, we agree with Jonathan that the court's decision is somewhat difficult to reconcile in key respects. It suffices to observe that Jonathan's testimony was brief, focused on the central issue of whether he knew of Peter's actions concerning the lease. It is difficult for this court to reconcile the trial court's finding that Jonathan and Peter were "largely credible" with its finding that Jonathan's testimony about the principal issue on which he testified—whether he was aware that he was guaranteeing Peter's debts—was "hard to believe." It is also unclear what legal theory the court relied on to impose joint and several liability because it concluded that Jonathan acted both explicitly and implicitly. On the one hand, the court stated that the defendants acted jointly in using Jonathan's name and credit, as the court found that they "knew what they were doing" in order to obtain an apartment for Peter, who was not creditworthy. On the other hand, the court stated that Jonathan did not give Peter explicit permission to use his name and credit but that, "as a dutiful son, permission was implied."[4]

More importantly, however, we agree with Jonathan that the court's decision appears to have been based, in part, on improper considerations. Regardless of whether there was a rational view of the evidence that might have supported the court's findings of fact, it appears that the court was swayed in its fact-finding by its own attitudes garnered from personal life experience. "[Triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life"; (internal quotation marks omitted) *In re Kristy A.*, 83 Conn. App. 298, 316, 848 A.2d 1276, cert. denied, 271 Conn. 921, 859 A.2d 579 (2004); "[n]evertheless, attitudes garnered from personal life experience cannot serve as a substitute for properly admitted evidence at a hearing where the court's mandate is to ascertain the intent of the parties. Judicial impartiality is the hallmark

of the American system of justice. . . . The background and experience of a trial judge are disqualifying only if they prevent that judge from assessing the evidence fairly and impartially. It is assumed that judges, regardless of their personal backgrounds and experiences in life, will be able to set aside any biases or predispositions they might have and consider each case in light of the evidence presented." (Citation omitted; internal quotation marks omitted.) *Schimenti* v. *Schimenti*, 181 Conn. App. 385, 402, 186 A.3d 739 (2018).

In the present case, the trial judge explicitly interjected his personal observations and beliefs into the decision. The judge stated that, in similar circumstances, he would have permitted his father to use his name and credit. The judge also expressed his belief that doing so was the obligation of "a dutiful son." Regardless of whether the court found that Jonathan acted explicitly or implicitly, it appears to have relied on the aforementioned personal beliefs, rather than the evidence, in finding that Jonathan had guaranteed the debt that Peter incurred with respect to the lease. Therefore, we are left with the definite and firm conviction that a mistake has occurred, for which the proper remedy is to reverse the judgment of the trial court and remand the case for a new trial.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] The defendants were self-represented before the trial court. Jonathan is self-represented in this appeal. Peter has not participated in this appeal.

[2] With respect to the allegedly newly discovered evidence, Jonathan asserts that "(1) the alleged lease supporting the complaint was fabricated; (2) [t]he case transcripts show beyond a reasonable doubt [that] the plaintiff committed perjury under oath at trial; (3) [t]he complaint contains several false and fraudulent misrepresentations by relying on the fabricated evidence; (4) the plaintiff's counsel submitted motions containing false statements and maliciously misrepresented the facts to the court, causing manifest injury and inequity; (5) the plaintiff gave knowingly false testimony and showed a reckless disregard for the truth; [and] (6) [t]he facts provided will conclude clearly and convincingly [that] the plaintiff and the plaintiff's counsel fraudulently took action against Jonathan knowing he was not a proper party to the action."

[3] To the extent that Jonathan argues that Cloutier engaged in fraudulent conduct, we observe that, in basic terms, a finding of "fraud" requires a subordinate finding of an intent to deceive. "Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." (Citations omitted; internal quotation marks omitted.) *Billington* v. *Billington*, 220 Conn. 212, 217, 595 A.2d 1377 (1991).

[4] This inconsistency in the court's decision is further clouded by the fact that, in finding that the defendants were jointly and severally liable, the court did not state whether it ultimately determined that Jonathan held Peter out as his agent or whether the court ultimately determined that Jonathan permitted Peter to exercise apparent authority on his behalf.