******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TALA E. H. *v.* SYED I.*
(AC 39706)

Lavine, Keller and Bear, Js.

*Syllabus*

The defendant appealed to this court from the judgments of the trial court continuing for six months a civil protective order that had been issued against him and denying his motions for contempt and clarification. Pursuant to statute (§ 46b-15 [a]), the plaintiff had filed an application for relief from abuse from the defendant, whom she identified as a person to whom she was married and with whom she resided in a property that he owned. In her affidavit, the plaintiff attested to many instances that the defendant had harassed, threatened and stalked her. The trial court granted the ex parte application and ordered the defendant not to assault, threaten, abuse, harass, follow, interfere with or stalk the plaintiff. The court also scheduled a hearing to determine whether the protective order should be continued beyond two weeks. The defendant thereafter filed a fifty-one page affidavit in response to the plaintiff's application and numerous requests for the court to subpoena certain persons to appear at the hearing, and the plaintiff submitted hundreds of text messages that she had received from the defendant. During the scheduled hearing, the court, instead of following normal procedure, had three police officers that the defendant had subpoenaed testify before the plaintiff presented her case because it anticipated a lengthy hearing and did not want to inconvenience the officers by having them wait in court until the end of the plaintiff's case to testify. After reviewing the text messages submitted by the plaintiff, the court described them as obsessive and horribly unpleasant, but stated that both parties had not been nice to each other. The court also offered to extend the protective order for sixty days and to permit the parties to return to court if the conflict between them had calmed down, but the parties rejected the court's offer of compromise. At the conclusion of the hearing, the court continued the protective order for six months, finding that the defendant had stalked the plaintiff pursuant to § 46b-15 (a). The court also ordered the plaintiff to remove all of her belongings from the defendant's property by a certain date. Thereafter, the defendant filed a motion for clarification of the court's order and a motion for contempt, claiming that that the plaintiff had not removed her possessions by the ordered date. The trial court denied the defendant's motions following a hearing, and the defendant appealed to this court. *Held*:

1. The defendant could not prevail on his unpreserved claim that the manner in which the trial court conducted the hearing on the continuance of the protective order constituted judicial misconduct and bias, the defendant having failed to demonstrate that the court exhibited bias against him and was guilty of judicial misconduct that affected the integrity of the proceeding and denied him a fair trial; a review of the record and transcript of the subject hearing demonstrated that the trial court did not prejudge the case and that there was a factual basis to continue the protective order against the defendant for six months, and although the trial court may have addressed the parties somewhat differently at times, the substance of its statements, its rulings and its order were predicated on its need to confine the hearing to relevant issues, to control its docket and to manage the proceedings in its courtroom.

2. The trial court did not misapprehend the facts or abuse its discretion by continuing the protective order for six months: that court's decision to continue the protective order was predicated on its findings that the defendant sent the plaintiff hundreds of obsessive text messages, went to the homes of her male companion and her family, visited her workplace, used security cameras at his property to monitor her and placed a tracking device on the car he permitted her to use to find her location, which constituted stalking under § 46b-15 (a), and contrary to the defendant's claim that the court's consideration of the security cameras and the tracking device was improper because he placed them for legitimate security purposes, the evidence demonstrated that he also used them

to keep track of the times the plaintiff came and went from the room that they had shared and to monitor her whereabouts, and, therefore, the court could have found that the defendant's behavior constituted stalking; moreover, although the court's finding that the defendant went to the home of the plaintiff's aunt was clearly erroneous, that finding was harmless error in the face of the overwhelming evidence that the defendant stalked the plaintiff.

Argued March 14—officially released July 10, 2018

*Procedural History*

Application for relief from abuse, brought to the Superior Court in the judicial district of New Haven, where the court, *Goodrow, J.*, granted the application; thereafter, following a hearing, the court, *Emons, J.*, continued the protective order; subsequently, the court, *Emons, J.*, denied the defendant's motions for clarification and contempt, and the defendant appealed to this court. *Affirmed.*

*Syed I.*, self-represented, the appellant (defendant).

*Opinion*

LAVINE, J. This appeal arises out of an order of protection issued against the self-represented defendant, Syed I., in favor of the self-represented plaintiff, Tala E. H.[1] On appeal, the defendant commingles claims related to the judgments rendered by the trial court when it continued the order of protection against him and thereafter when it denied his postjudgment motions for contempt and clarification. Specifically, the defendant claims that the trial court (1) was guilty of judicial misconduct and bias, (2) denied him due process by failing to rule on his discovery motions, (3) denied him the right to a public trial, (4) misread the evidence, (5) abused its discretion by failing to create a record of certain testimony, and (6) improperly denied his motions for contempt and clarification.[2] The majority of the defendant's claims are inadequately briefed, and, therefore, we address only his judicial misconduct and evidentiary claims.[3] We affirm the judgments of the trial court.

The following facts and procedural history are relevant to our resolution of the defendant's reviewable claims on appeal. See footnote 2 of this opinion. On September 1, 2016, the then nineteen year old plaintiff filed an application for relief from abuse from the then forty-one year old defendant whom she identified as a person to whom she was married and with whom she resided in a property owned by him.[4] See General Statutes § 46b-15 (a). In her affidavit, the plaintiff attested that beginning on August 16, 2016, the defendant began to harass her by sending her a text message that he was going to have her evicted from her room and that he would break into her room unless she voluntarily returned certain of his possessions. The plaintiff feared for her safety and well-being, and began to stay at another address. When she returned to her room, she found that a large number of her belongings were gone, including a laptop computer, a marriage certificate, clothing, cosmetics, and jewelry. She reported the break-in to the police, who told her that nothing could be done because the defendant, whom she suspected to be the perpetrator of the theft, was her husband. The plaintiff also attested that several days later the defendant reported to the police that the motor vehicle he had given her as a gift was missing and claimed that the plaintiff's friend D had stolen it. The defendant used a tracking device to locate the car at the address where the plaintiff was staying.

The plaintiff further attested that the defendant harassed her to find out where she was working. One day, he appeared at her workplace and misrepresented himself to one of the plaintiff's coworkers in order to see her. The defendant made a beverage purchase and, after paying for it, gave the plaintiff a vulgar, handwritten note. He remained in the workplace for a while before

leaving. The plaintiff and D worked at the same store, and the plaintiff told her about the incident. In his effort to locate the plaintiff, the defendant had been sending text messages to D "as a relationship counselor." D sent a text message to the defendant telling him not to come to the plaintiff's workplace. The plaintiff attested that the defendant, claiming discrimination, sent D's message to the corporate headquarters of the store, which caused D to lose her employment.[5]

The plaintiff also attested that the defendant installed cameras outside the door to her room and hired someone to follow her in a car. She also attested that the defendant verbally abused her and yelled at her in public. In addition, he sent her text messages about sexual acts that disturbed her. He researched her family in order to contact her aunt and her uncle at their respective homes in Connecticut and telephone her father in the country of Lebanon. According to the plaintiff, the defendant begged her to return to the room they shared and continued to harass her by sending her text messages.

The plaintiff averred that she received an e-mail message from her bank stating that she needed to activate her bank card as soon as possible. She had never received a bank card so she believed that the defendant had taken it and used it to take funds from her account. She claimed that the defendant was interfering with her everyday life and the lives of her friends. The plaintiff was terrified of the defendant. Although she asked him to leave her alone, he continued to send text messages to her. She attested that the defendant was "attempting to ruin [her] life in any way he can."

The court, *Goodrow*, *J.*, granted the ex parte application and ordered the defendant to surrender all firearms and ammunition and not to assault, threaten, abuse, harass, follow, interfere with, or stalk the plaintiff, and scheduled a hearing to determine whether the protective order should be continued beyond two weeks. The defendant was served with notice of the hearing to be held on September 14, 2016. The defendant filed a fifty-one page affidavit in response to the plaintiff's application.[6] He also filed numerous requests that the court subpoena certain persons to appear at the hearing.[7]

On September 14, 2016, the parties appeared before the court, *Emons*, *J.*, and presented evidence and argument. The plaintiff placed into evidence a sheaf of text messages she had received from the defendant from mid to late August, 2016, that was, according to the court, more than one and one-half inches thick. The court read them and described them as "[h]orribly, horribly unpleasant exchanges." On cross-examination, the defendant asked the plaintiff why she felt threatened by him, and the plaintiff testified: "[Y]our actions have proved that time after time, texting me excessively, showing up at my employers, contacting friends and

family of mine that you have no reason to contact and showing up at their homes . . . their employers, getting them fired and that's why I believe so."

The defendant stated to the court that he had not threatened the plaintiff and that he had not intended to harass her. He explained that he wanted to present evidence through third parties to discredit the plaintiff's credibility and character and that she sought an order of protection only because he was evicting her from the room he had rented to her. Although the court acknowledged that the plaintiff at times may not have been truthful, it stated that her character was not the issue under § 46b-15 (a).

During the hearing, the court stated that the parties needed to leave one another alone and offered to extend the protective order of no communication for sixty days and to permit the parties to return to court if the conflict between them calmed down. The court also stated that, in the voluminous exchange of text messages, neither party had been nice to the other. Neither party, however, was willing to accept the court's offer of compromise.

At the conclusion of the hearing, the court continued the protection order of no contact for six months, through March 14, 2017, subject to modification. The court stated to the defendant that it had considered all of the evidence, including "hundreds and hundreds of obsessive texts, most of which are not particularly very nice; the fact that you went to her boyfriend's home or friend, I don't know what he is really; the fact that you went to the aunt's house; the fact that you went to the uncle's house; the fact that you installed cameras in the house specifically looking at her door and were texting her on what time she came and went; the fact that you admitted that you put tracking devices in her car. This is a stalking type of situation and it, I believe, the fact that there was testimony about your using other people's cars to follow her so that she won't know who you are, it is not only stalking and complies with the statute in that manner, but I believe that the continuous constant interaction that was clearly not welcome is sufficient to . . . instill in her a continuous threat or threatening based upon the statute . . . ." The court also ordered the plaintiff to remove all of her belongings from the defendant's property by September 30, 2016, and that the parties communicate through a third party.

On September 20, 2016, the defendant filed a motion for clarification of the court's order that the plaintiff remove her belongings from his property. On September 29 and October 3, 2016, he filed motions for contempt claiming, inter alia, that the plaintiff had not removed her possessions by September 30, 2016. The court denied the defendant's motions following a hearing held on October 7, 2016. The defendant filed the present appeal on October 13, 2016.

We begin with the generally applicable standard of review. "[T]he standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented." (Footnote omitted; internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 111, 89 A.3d 896 (2014).[8]

I

The defendant's first claim is that the manner in which the court conducted the hearing on the continuance of the protective order constituted judicial misconduct and bias and caused him "duress." We have reviewed the entire transcript of the hearing and disagree that the court was guilty of bias or judicial misconduct.

At no time during the September 14, 2016 hearing did the defendant ask the court to recuse itself or move to disqualify the judge. His claim of judicial bias and misconduct, therefore, is unpreserved and raised for the first time on appeal. Ordinarily, a reviewing court will not entertain an issue raised for the first time on appeal. See *Schimenti* v. *Schimenti*, 181 Conn. App. 385, 392, A.3d (2018). Even though his claim is unpreserved, the defendant did not request review pursuant to one of the exceptions by which this court may review unpreserved claims.[9] In his appellate brief, the defendant acknowledged that he did not object to the court's statements that he found to be biased "as he felt intimidated, and objection would have been fruitless and may have even resulted in further error and reprimand . . . [which] resulted in harmful error that affected the integrity of the proceeding and reversible error leading not to a fair trial on the facts but a trial on the temper or whimsies of" the court.

"[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant, or interest in the outcome of [a] particular case." (Citation omitted; internal quotation marks omitted.) *Bracy* v. *Gramley*, 520 U.S. 899, 904–905, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). "Judicial impartiality is the hallmark of the American system of justice." 48A C.J.S. Judges § 247 (2018). Following our review of the defendant's brief, we construe his alleged judicial bias and misconduct assertions to set forth a claim of plain error. Pursuant to Practice Book § 60-5, we may, in the interest of justice, notice plain error claims not brought to the attention of the trial court.

"[A]lthough this court may review an unpreserved claim of judicial bias for plain error, not every claim of partiality warrants reversal on the basis of plain error." *Schimenti* v. *Schimenti*, supra, 181 Conn. App.

392. In the present case, we have reviewed the defendant's claim of judicial bias under the plain error doctrine because it allegedly implicates the basic concept of a fair trial; see *Cameron* v. *Cameron*, 187 Conn. 163, 168, 444 A.2d 915 (1982); but we found no evidence of bias, misconduct, or impartiality in the record.

The plain error doctrine "is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *Schimenti* v. *Schimenti*, supra, 181 Conn. App. 392–93.

When an appellate court addresses a claim of plain error, the court "first must determine if the error is indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in the light of the record." (Internal quotation marks omitted.) Id., 393. In addition, "the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) Id.

The standard employed by a court reviewing a claim of judicial bias "is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Internal quotation marks omitted.) *State* v. *Carlos C.*, 165 Conn. App. 195, 207, 138 A.3d 1090, cert. denied, 322 Conn. 906, 140 A.3d 977 (2016).

A reviewing court is mindful that "adverse rulings, alone, provide an insufficient basis for finding bias even when those rulings may be erroneous." *Schimenti* v. *Schimenti*, supra, 181 Conn. App. 395. "[O]pinions

formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." (Internal quotation marks omitted.) Id.

In his brief on appeal, the defendant has identified, in isolation, words and phrases stated by the court that he contends demonstrate judicial bias and misconduct. Our reading of the transcript of the September 14, 2016 hearing demonstrates that the defendant has taken the court's words and phrases out of context and, in doing so, has misconstrued and mischaracterized them.

He contends that at the beginning of the hearing, the court singled him out by admonishing his behavior, but did not speak to the plaintiff in a similar fashion. The transcript reveals that when the hearing commenced, the court asked the plaintiff why the case was before the court. The plaintiff responded that "[t]his man has been harassing me, among my family as well and my friends, hiring people to follow me, showing up at my workplace, contacting me excessively when I've been clear that I don't want to be contacted." The court informed the defendant that Judge Goodrow had issued a temporary restraining order against him and asked him if he had surrendered his firearms and ammunition. The defendant stated that he did not have any. The following colloquy transpired:

"The Court: Terrific. And you may not assault, threaten, abuse, harass, follow, interfere with, or stalk the complainant.

"[The Defendant]: My response is, I never did.

"The Court: I'm sure that you believe that you never did, but I'm asking you a question, and I'm going to ask you to focus on my questions, okay? Are you aware that the restraining order was granted claiming that you do not assault, threaten, or ordering, that you do not assault, threaten, abuse, harass, follow, interfere with, or stalk the complainant?

"[The Defendant]: Yes.

"The Court: Okay, that's why we are here. We are going to have a hearing today. Your hearing is going to be right now. How many people, sir, did you subpoena to court today?

"[The Defendant]: Your Honor, I subpoenaed five people."

The court then asked the defendant to identify the five people, which he did. Three of the five people were police officers. The court then explained how the

hearing would proceed: "[N]ormally, when we have a hearing like this, I allow the complainant to tell me her side of the story first . . . and you may, if you can be professional and respectful and I approve of the questions that you ask, I will allow you to ask her questions if they're relevant and they have to adhere to all of the rules of evidence, all right? Then it's your turn to put on your case after she has whoever it is that she wants to testify. She may call her aunt, her uncle, she may call the police. Okay? Then it is your turn.

"I'm going to do things a little bit differently today, because I feel, and I have a little bit of a sixth sense that we have three officers sitting in court today who probably shouldn't be here. So, I'm going to take them out of order, and I'm going to hear from them subject to your questions and subject to the plaintiff's questions and try to find out what their independent knowledge is of the complaints in this case. My goal is to get them out of here as quickly as you got them here. Okay, so who[m] would you like to start with first?"

The defendant called three police officers individually who testified briefly about their interaction with the parties.[10] Several times while the defendant was examining an officer, the court interrupted and stated: "[L]et me see if I can focus you better because I see you with reams of paper around you, and I can tell you before we even begin this hearing, that you are what I would consider to be very over prepared and by that I mean that much of what you are focusing on may not be relevant to why you're here today. So, let me read you the statute, okay? And this is the only thing that I'm going to be listening to today." The court once informed the defendant that the questions he was asking were improper because the information he sought to elicit was not relevant under the statute. After each of the officers testified, the court excused them and stated: "I'm going to move this case aside for a little bit right now and get these people back to their duties and responsibilities at work rather than here where they shouldn't have come to begin with, okay. [The parties are] going to take a backseat. I'm going to try to get some other cases dealt with, and then I'm going to reconvene this hearing and we're going to start with [the plaintiff]. I'm going to hear her version. You [the plaintiff] are free to put on whatever witnesses you would like and then, sir, you will put on your case, and I will make a final decision."

In our view, the transcript does not disclose that the court singled out the defendant or treated him differently from the plaintiff. At the beginning of the hearing, before taking evidence, the court stated its expectations and the procedure it would follow. In other words, it set the "ground rules" for the way in which the hearing would be conducted. Given the court's experience adjudicating protective orders, the affidavits and informa-

tion in the file, the court's statement, although directed toward the defendant, set the parameters for the entire hearing. It also instructed the self-represented parties with respect to appropriate courtroom decorum. The court's words and instructions would be appropriate for any hearing on a protective order.

"A judge, trying the cause without a jury, should be careful to refrain from any statement or attitude which would tend to deny [a party] a fair trial. . . . It is [her] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted.) *In re Nathan B.*, 116 Conn. App. 521, 525, 977 A.2d 224 (2009).

"[E]ach judge brings to the bench the experiences of life, both personal and professional. A lifetime of experience that has generated a number of general attitudes cannot be left in chambers when a judge takes the bench. Thus, a judge's average personal experiences do not generally lead to reasonable questions about the judge's impartiality and subsequent disqualification." (Internal quotation marks omitted.) *Schimenti* v. *Schimenti*, supra, 181 Conn. App. 402 n.9.

The defendant also takes exception to the court's having stated, "I'm going to do things a little bit differently today, because I feel, and I have a little bit of a sixth sense that we have three officers sitting in court today who probably shouldn't be here." In his brief on appeal, the defendant stated that the court's use of the words "sixth sense" to explain why it was going to hear evidence outside the usual order in which evidence is presented caused him to believe that the court had prejudged the case. When the court's words are read in the context of the proceeding, however, it is apparent that the court was anticipating a lengthy hearing. The court had reviewed the file and stated that the plaintiff had submitted an affidavit that was one and one-half pages long and that the defendant had submitted a reply that was fifty-one pages long. It also knew that the defendant had submitted numerous requests for the court to issue subpoenas. Moreover, the court observed the pile of papers on the desk in front of the defendant and stated that perhaps he had "over prepared."

By virtue of its experience dealing with protective orders, the court took steps to manage its docket. There were multiple cases before the court that day. By permitting the defendant, rather than the plaintiff, to start by presenting the testimony of the police officers whom he had subpoenaed, the court enabled the police officers to return to duty relatively quickly without having to wait until the end of the plaintiff's case to testify. The court, therefore, permitted the defendant to present the evidence he wished with minimal inconvenience to the police officers and other litigants. The court's actions demonstrated reasonable trial management and

concern for the public. We discern nothing improper about the court's "sixth sense" about the presence of police officers and allowing them to testify first. The court appropriately managed the proceedings in its courtroom and in no way disadvantaged the defendant.

In further support of his claim that the court was biased, the defendant argues that the court required him to make offers of proof with respect to the witnesses he had subpoenaed. The court explained to the defendant that it wanted him to make offers of proof to determine whether the evidence was relevant to the plaintiff's claim that the defendant was harassing her and whether the witnesses had firsthand knowledge of the alleged harassment. The court's requiring the defendant to make an offer of proof was done for appropriate evidentiary and trial management purposes.

Before the defendant presented his case, he stated that the plaintiff "made a number of allegations . . . in her conversation . . . [w]hich are not correct." The court stated in reply: "[T]he fact that you believe that she has made allegations that are not correct, they may be very important to you. It's probably not as important to me for the simple reason that two people can be in the same room at the same time and see things differently. Okay? I am interested in facts about what happened when. That's as much as I'm going to tell you. I'm going to allow you to question if you can do it properly and respectfully. If you can't [do that] or get off the rails, I'm going to stop you. I'm just telling you that."

When the defendant wanted to present evidence that the plaintiff had his passport and his green card in her possession, the court asked him how he intended to prove that assertion. The following colloquy occurred:

"[The Defendant]: I'm just trying to undermine her credibility, Your Honor.

"The Court: Right, but you're killing me trying to do that. There's no nice way of saying that."

The defendant claims that the court's use of the words "off the rails" and "killing me" were threatening to him and that he was nothing other than polite and respectful to the court. He claims that such words caused him duress and that he felt intimidated by the court.[11]

The court devoted the better part of a day to the hearing and recessed it on a number of occasions to hear other matters and to permit the defendant to secure evidence. Although the court used colloquial expressions such as "going off the rails" and "killing me," "isolated venting of frustration" does not necessarily require reversal. *In re Nathan B.*, supra, 116 Conn. App. 526. In the present matter, the court made efforts on numerous occasions to explain to the defendant what evidence was relevant with respect to § 46b-15 (a) and what was of no consequence. Nevertheless, the defendant frequently prefaced his questions with his

own view of the facts and sought to present irrelevant testimony. The court repeatedly tried to make clear to the defendant that the issue was not whether the plaintiff was not a nice person, but whether he had harassed, threatened or stalked her. The court's use of colloquial language does not in and of itself demonstrate bias.

The defendant also claims that the court was biased against him because it reprimanded him for referring to the plaintiff as "that lady" but did not admonish the plaintiff for referring to him as "that man." In addition, the defendant argues that the court described the text messages he sent to the plaintiff as horribly unpleasant[12] but did not similarly describe text messages that he received from the plaintiff, which he had placed in evidence. Although it did not say so at that time, when it extended the protective order for six months, the court stated that "neither one of you were nice to each other . . . ." While the defendant has cited a few instances in which the court spoke somewhat differently to the plaintiff than to him, he has not demonstrated how that disparate use of language prejudiced him with respect to the court's finding that he had stalked the plaintiff pursuant to § 46b-15. See part II of this opinion. He acknowledged that he "badgered" the plaintiff with text messages and that he was controlling. He admitted that he went to her workplace and gave her a handwritten message, tracked her when she was operating his motor vehicle, used surveillance cameras to observe her comings and goings, and visited her friends and family to ascertain information about her.

The defendant also contends that the court's offer of a compromise was a veiled threat that he present no more evidence. The following facts are related to this claim. Prior to the midday recess, the defendant wanted to place a copy of a certain e-mail he had received from the plaintiff into evidence, but he was unable to find it among his papers. The court offered to take another recess until 2 p.m.[13] The court also stated: "This is absolutely absurd. I've heard enough. I'm going to let you talk as much as you want to talk. It is unlikely to alter what I'm already considering based on the documents that you've given me. Okay. You need to leave each other alone. . . .

"Would you agree to an order not to communicate with her and you guys . . . and I can continue this order for sixty days, and you can come back here in sixty days to make sure that everything is all quiet? Would you agree to something like that?" The defendant stated that he was concerned about his reputation in a small university town and his employment. He referenced the security cameras that he had installed in the properties he rents to students. The court responded as follows:

"The Court: Sir, I'm not worried about the cameras. What I really do have to say is that I think that you're

becoming very consumed with issues that you worry that I'm thinking about. I'm not thinking about that. I am only thinking about the statute; that's all I'm thinking about, and I want you to know that based on what you said in your own texts gives me reason to think that there should probably be a stay away period for a couple of months and if you can behave yourself, given the fact that you're not married anymore, and if you do not assault, threaten, abuse, harass, follow, interfere with, or stalk her, I have no interest in changing and making this more restrictive. My suggestion is that we continue it for a little period of time and let things calm down and stop and then come back and you guys can go your separate ways.

* * *

"Based on the information I have, I will keep the restraining order exactly the way it is. If you want to come back this afternoon and you believe that you have more information to change my mind and demonstrate that a restraining order should not exist, I am more than happy to hear from you and your witnesses. So, what I'm trying to suggest is . . . [i]f you by agreement, and by the way, I can continue a restraining order for one year. . . . My thought is that to quiet things down, this has gotten way out of control, way out of control. . . . My thought is to keep the peace for sixty days and come back and let's revisit it. If that is unacceptable to you, I will see you back here at 2 [p.m.]."[14]

The defendant argues on appeal that the court was more restrictive of his questioning of the plaintiff following the midday recess. The record discloses that the court stated to the defendant that it was going to be less lenient with his questions in order to move the case along. The transcript reveals that the evidence the defendant desired to present did not address harassment and the voluminous text messages, his tracking the motor vehicle the plaintiff was operating, and his visiting her workplace and her family and friends but, rather, whether she had his green card and passport. The defendant stated that the evidence was an indication of the plaintiff's character. The court informed the defendant that the evidence he wished to present was not relevant to the protective order. We agree with the court.

On the basis of our review of the record, including the entire transcript and the many text messages written by the defendant that were placed into evidence, we conclude that the court did not prejudge the case and that there was a factual basis to continue the protective order against the defendant for six months. Although the court may have addressed the parties somewhat differently, the substance of its statements, its rulings, and its order were predicated on its need to confine the hearing to relevant issues, to control its docket, and to manage the proceedings in its courtroom. The

defendant has not persuaded us that the court exhibited bias against him and was guilty of judicial misconduct that affected the integrity of the proceeding and denied him a fair trial.[15]

## II

The defendant's second claim is that the court misread the evidence. As expressed by the self-represented defendant, it is not a recognizable appellate claim. We, however, construe the claim to be that the court's factual findings are clearly erroneous and that the court abused its discretion by continuing the order of protection for six months. We are not persuaded by the defendant's claim.

The defendant's claim is predicated on the court's oral decision to continue the order of protection for six months subject to modification. At the conclusion of the hearing the court stated in part to the defendant: "I believe that given all of the documents that I have with hundreds and hundreds of obsessive texts, most of which are not particularly very nice, the fact that you went to her boyfriend's home or friend, I don't know what he is really, the fact that you went to the aunt's house, the fact that you went to the uncle's house, the fact that you installed cameras in the house specifically looking at her door and were texting her on what time she came and went, the fact that you admitted that you put tracking devices in her car, this is a stalking type of situation and it, I believe, the fact that there was testimony about your using other people's cars to follow her so that she won't know who you are, it is not only stalking and complies with the statute in that manner, but I believe that the continuous constant interaction was clearly not welcome is sufficient to have her or instill in her a continuous threat of threatening based upon the statute and a continuous threat."

"In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's finding of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Joni S.* v. *Ricky S.*, 124 Conn. App. 170, 173, 3 A.3d 1061 (2010).

The protective order at issue is governed by § 46b-15 (a), which the court read several times to explain to the defendant what evidence was relevant to the proceedings. Section 46b-15 (a) provides in relevant part: "Any family or household member . . . who has been subjected to a continuous threat of present physi-

cal pain or physical injury, *stalking* or a pattern of threatening, including, but limited to, a pattern of threatening, as described in section 53a-62, by another family or household member may make an application to the Superior Court for relief under this section  . . . ." (Emphasis added.)

"Stalking is defined as [t]he act or an instance of following another by stealth. . . . The offense of following or loitering near another, often surreptitiously, to annoy or harass that person or to commit a further crime such as assault or battery. . . . To loiter means to remain in an area for no obvious reason. . . . We interpret the statute in accordance with these commonly accepted definitions, satisfied that the plain meaning of the statute does not yield an unworkable or absurd result." (Citations omitted; internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App.115.

On the basis of our review of the record and the court's oral decision, we conclude that the court did not abuse its discretion in continuing the protective order for six months. The court's decision indicates that it was predicated upon its findings that the defendant sent the plaintiff hundreds of obsessive text messages, went to the homes of her male companion and her family, visited her workplace, used security cameras to keep track of her, sent her text messages questioning her about the time she came and went, and placed a tracking device on the car he permitted her to use to find her location. Such acts constituted stalking under § 46b-15. The defendant admitted that he badgered the plaintiff with text messages and does not deny that he visited her male friend. He does, however, claim that the court's consideration of the security cameras and the tracking device on the car the plaintiff used was improper. We disagree.

With respect to the security cameras, the plaintiff acknowledged that they were placed in the hallways for security purposes. The evidence demonstrates, however, that the defendant also used them to keep track of the times the plaintiff came and went from the room that they had shared. On the basis of that information, he sent the plaintiff text messages asking her what she was doing, whom she was with, where she had been and where she was going.

As to the tracking device on the motor vehicle the defendant gave the plaintiff to use, the defendant claims that he put the tracking device on the vehicle on the advice of his insurance company and that he was permitted to affix a tracking device to his motor vehicle and to use it in the event the vehicle was stolen. He, however, used the tracking device to monitor the plaintiff's whereabouts, and, therefore, the court could find that the defendant's behavior constituted stalking.

We agree with the defendant's claim that the court's finding that he went to the home of the plaintiff's aunt was clearly erroneous because she testified that she visited him when the plaintiff did not respond to her phone calls. We conclude, however, that that finding is harmless error in the face of the overwhelming evidence that the defendant stalked the plaintiff when she requested space and wanted to be away from him. "In order to constitute reversible error . . . the ruling must be both erroneous and harmful. . . . The burden of proving harmful error rests on the party asserting it . . . and the ultimate question is whether the erroneous action would likely affect the result." (Internal quotation marks omitted.) *Cragg* v. *Administrator, Unemployment Compensation Act*, 160 Conn. App. 430, 443–44, 125 A.3d 650 (2015).

The defendant has failed to demonstrate that the court's finding as to his visiting the plaintiff's aunt at her home was harmful, as the location of their interaction was not relevant to any of the issues concerning the continuation of the protective order. The defendant admitted that he visited the plaintiff's uncle, her male friend and her workplace, tracked the motor vehicle she was using, called her father in Lebanon, and sent her many text messages that he thought were justified or permissible because he was in a relationship with her and he believed that she had been unfaithful to him. For the foregoing reasons, we conclude that the court did not "misapprehend the facts" and did not abuse its discretion by continuing the protective order of no contact for six months.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

[1] The plaintiff represented herself in the trial court and did not participate in the present appeal. We therefore decided the appeal on the defendant's brief and the record.

[2] He also claims that the New Haven Superior Court denied him due process with respect to the hearing on the protective order because the public notice board contained an inaccurate list of judge and courtroom assignments for the day.

[3] Although the defendant is a self-represented litigant, "the [General] [S]tatutes and rules of practice cannot be ignored completely. . . . We are not required to review issues that have been improperly presented to this court though an inadequate brief. . . . Analysis, rather than abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of [relevant] authorities, it is deemed to be abandoned." (Citations omitted; internal quotation marks omitted.) *Lareau* v. *Burrows*, 90 Conn. App. 779, 780, 881 A.2d 411 (2005).

[4] The plaintiff and defendant represented that they were married in a religious ceremony but that they were not married pursuant to Connecticut law.

[5] In his response to the plaintiff's application for an order of protection, the defendant denied that he complained about D, but he acknowledged that he forwarded D's message to the corporate headquarters and inquired

whether D's asking him not to visit the store "was in line with the corporate policy."

[6] In his response to the plaintiff's affidavit, the defendant stated that he and the plaintiff had a four month boyfriend-girlfriend relationship and shared a room in one of the properties that he owned. In addition, he stated that he and the plaintiff had intended to marry and had completed the first of the two steps toward a Muslim marriage by receiving the blessing of a sheikh. He admitted to a number of the plaintiff's allegations of harassment such as tracking the car she was driving, going to her workplace, taking a laptop computer from the room they shared, contacting members of her family, and sending her many text messages, some of which were sexually explicit. He justified his behavior on the ground that he and the plaintiff were in a relationship, and, therefore, the communication was normal and that his reaction to learning that she allegedly had been unfaithful to him was understandable. He denied that he had stolen some of the plaintiff's belongings and blamed their disappearance on third parties. He asserted that the plaintiff was mentally ill and that she had sought an order of protection because he was evicting her from the room he had rented to her. He also stated that he had ended his relationship with the plaintiff by having a sheikh tell her that the parties were divorced as of August 30, 2016. He claimed that, except to wish her well, he had not communicated with the plaintiff since August 30, 2016, when she told him unconditionally that she did not want to communicate with him. He stated that he would have nothing more to do with the plaintiff after the separate eviction proceeding was complete in a week or so.

[7] The court, *Hon. James G. Kenefick, Jr.*, judge trial referee, denied most of the defendant's subpoena applications.

[8] "Section 46b-15 is part of title 46b, Family Law, and chapter 815a, Family Matters, and, as such, is specifically included as a court proceeding in a family relations matter. See General Statutes § 46b-1 (5)." (Internal quotation marks omitted.) *Princess Q. H.* v. *Robert H.*, supra, 150 Conn. App. 111 n.3.

[9] Under appropriate circumstances, a reviewing court may review unpreserved claims of error pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), its supervisory powers; see Practice Book § 60-2; or the plain error doctrine. See Practice Book § 60-5.

[10] One of the officers testified about his investigation of the plaintiff's use of the defendant's motor vehicle. The other two officers testified about their investigation into a break-in of the plaintiff's room.

[11] The defendant's claim that the court caused him duress is not explained in his brief, and, therefore, we, do not address it.

[12] The court asked the defendant if he had any objection to the text messages that the plaintiff offered into evidence. He stated that he had "absolutely no objection." The following colloquy transpired:

"The Court: You have no object[ion]; that's terrific. I'm going to take all of those texts, and I'll represent on the record that there's at least, from what I can see here, about an inch to an inch and a quarter's worth of a stack of texts. . . . It's probably bigger than that. It's probably an inch and three-quarters. Oh, this is quite telling, actually, sir, as I read through these. Horribly, horribly unpleasant exchanges. You're smiling. . . . [Y]ou must think . . . [t]hat this is very amusing.

"[The Defendant]: No, I beg your pardon, Your Honor. . . . I have similar texts. These were the things that were happening in [the] relationship.

"The Court: No, sir. No, sir, maybe your relationships, but these are not things that happen in relationships."

We have reviewed the text messages, including personal and intimate language and sexually explicit photographs, which are part of the record. We concur with the court's description of some of them.

[13] The plaintiff objected to recessing until 2 p.m., stating that she had to work at that time. The court ordered her to call and let her employer know that she would not be in at 2 p.m.

[14] Following the midday recess, the court permitted the defendant to speak at length. He stated, in part, that the plaintiff was a free spirit and probably was "not happy . . . getting tied down with" him. She had certain habits, such as smoking marijuana, that he did not approve of. When she did not return to the room they shared in early August, he tried to find out what she was up to. He believed that she had a lover and was upset. With respect to the reams of text messages he sent the plaintiff, he did not believe that they constituted a threat to her but that they revealed his reaction when he "saw that the lady [he] was madly in love with was up to something

. . . .” He had given her his car to use, and she was using it for her enjoyment while he sat at home alone. To find out what was going on, he attached a tracking device to the car. He stated that he had respected the plaintiff's wishes not to be intimate with him before marriage. When he learned of her male friend, it really hurt him. He told the plaintiff that he was going to divorce her; he made plans to see the sheikh. He was embarrassed before his conservative family and could not tell his friends.

The defendant argued that his communication and interaction with the plaintiff did not constitute threats. He admitted that he may have been controlling but that it was nothing more than putting the plaintiff on a better path for a better tomorrow. He found her to be very intelligent for a twenty year old, and he was in awe of her. He treated the plaintiff like a daughter in many ways to guide her toward a better path. He concluded that perhaps he had trespassed and did not realize it.

[15] The defendant also claims that the court's body language and facial expressions manifested judicial bias. The record is inadequate for us to review such a claim.

---