******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# J. R. *v.* N. K.*
## (AC 46564)

Bright, C. J., and Westbrook and Prescott, Js.**

*Syllabus*

The plaintiff appealed from the trial court's judgment dismissing his application for relief from abuse, which had sought the issuance of a domestic violence restraining order against the defendant, his former domestic partner. The plaintiff claimed, inter alia, that the court improperly concluded that the defendant was not exercising coercive control and/or stalking the plaintiff pursuant to statute (§ 46b-1 (b) (2) and (4)). *Held*:

This court, concluding that the language of § 46b-1 (b) (4) was clear and unambiguous and that the examples set forth therein did not constitute an exhaustive or exclusive list, applied a broader definition of the term than used by the trial court, and determined that the plaintiff failed to establish a prima facie case that the defendant had, in purpose or effect, unreasonably interfered with the plaintiff's free will and personal liberty, as any coercive control contemplated by § 46b-1 (b) (4) had ended by the time the plaintiff filed the application for a domestic violence restraining order.

The trial court properly concluded that the plaintiff had failed to establish a prima facie case that the defendant had stalked the plaintiff pursuant to § 46b-1 (b) (2), as there was a legitimate purpose for all of the defendant's communications to the plaintiff, including emails with attachments of judgment liens and mortgage related documents for a property the parties owned, and they were not sent with the intent to harass, terrorize or alarm.

This court concluded that the plaintiff's unpreserved claim that he was denied his federal and state constitutional right to equal protection when he was treated differently than similarly situated heterosexual or female victims was not supported by any evidence of discrimination or bias by the trial court, as the record was devoid of any evidence that the trial court had selectively treated the plaintiff for impermissible reasons, and the plaintiff's reliance on the outcome of other cases involving different facts did not suggest otherwise.

---

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103 § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

The trial court improperly dismissed this action for failure to diligently prosecute pursuant to the rule of practice (§ 14-3) because the defendant should have moved for a judgment of dismissal pursuant to the rule of practice (§ 15-8), rather than for a directed verdict, the case having been tried to the court and not to a jury, and, accordingly, this case was remanded with direction to render a judgment of dismissal pursuant to Practice Book § 15-8.

Argued December 9, 2024—officially released May 6, 2025

*Procedural History*

Application for relief from abuse, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Hon. Michael E. Shay*, judge trial referee, issued a temporary restraining order ex parte; thereafter, the case was tried to the court, *Heller, J.*; subsequently, the court, *Heller, J.*, granted the defendant's motion for a directed verdict, denied the plaintiff's application for relief from abuse and rendered a judgment of dismissal, from which the plaintiff appealed to this court. *Improper form of judgment*; *reversed*; *judgment directed*.

*Brody E. Tice*, with whom was *David V. DeRosa*, for the appellant (plaintiff).

*Jennifer Neal Bardavid*, for the appellee (defendant).

*Opinion*

BRIGHT, C. J. The plaintiff, J. R., appeals from the trial court's order dismissing his application for relief from abuse seeking the issuance of a domestic violence restraining order against the defendant, N. K. On appeal, the plaintiff claims that the trial court improperly (1) concluded that the defendant was not exercising coercive control and/or stalking the plaintiff, (2) denied the plaintiff his federal and state right to equal protection, and (3) dismissed the plaintiff's application for failure to prosecute with reasonable diligence. We disagree with the plaintiff as to the first two claims but conclude that the form of the judgment is improper. We therefore

remand this case with direction to dismiss the plaintiff's application for failure to establish a prima facie case pursuant to Practice Book § 15-8.

The following undisputed facts, as evidenced by the record, and procedural history are relevant to our consideration of this appeal. On May 3, 2023, the plaintiff filed an application for relief from abuse pursuant to General Statutes § 46b-15, seeking a restraining order against the defendant. In his affidavit in support of his request for relief, the plaintiff averred the following facts. The plaintiff and the defendant entered into a domestic partnership in 1999. In 2008, the parties jointly purchased a residential property where they resided together. The plaintiff eventually became aware that the defendant was making unauthorized withdrawals from the plaintiff's financial accounts, including his retirement account. The plaintiff also learned of several lawsuits involving the defendant's attempts to defraud others and that one of the defendant's immediate family members had a history of serious criminal conduct. Based on these facts, the plaintiff and the defendant ended their relationship in May, 2019.

The plaintiff asked the defendant if he would agree to sell their property, but the defendant repeatedly refused. The plaintiff thereafter learned that, while they were still domestic partners, the defendant secretly had married S, an Iranian immigrant whom the defendant brought into the United States on a marriage visa. According to the plaintiff's affidavit, in June, 2022, the plaintiff commenced an action against the defendant to compel the sale of the property.

In December, 2022, the plaintiff learned that, in addition to making unauthorized withdrawals from the plaintiff's accounts, the defendant had engaged in fraudulent transactions using financial accounts that the defendant had opened in the plaintiff's name using the

plaintiff's personal information. The plaintiff reported the defendant's conduct to the Internal Revenue Service (IRS), the Federal Bureau of Investigation, and other appropriate law enforcement agencies. On January 20, 2023, shortly after learning that the plaintiff had reported his criminal conduct, the defendant directed S to move into the parties' residence. The plaintiff further averred that, "[a]s it was not safe to be in the same home and outnumbered by individuals who [had] stolen [his] personal identity and committed crimes against [him] and others, [he] was immediately forced to move out and seek emergency housing. [He] was advised not to disclose that address for personal safety reasons. At that same time, [he] was also advised to block [the defendant] from contacting [him] on [his] cell phone."

On February 27, 2023, the defendant began sending emails to the plaintiff's email address associated with the corporation where the plaintiff worked. Some of these emails contained, in the subject line, key words, such as "FRAUD" and "FRAUDULENT" in boldface type and capital letters. The plaintiff believed that these emails were intended to trigger review by his employer's compliance department and put his position at risk. On February 28, 2023, the plaintiff's attorney sent an email to the defendant's attorney stating that the defendant was not to contact the plaintiff at work or by any other means. Notwithstanding the email from the plaintiff's attorney on February 28, 2023, the plaintiff averred that the defendant continued to send harassing emails to the plaintiff's corporate email address.[1]

On March 27, 2023, the plaintiff filed a report with the Westport Police Department. At this time, the plaintiff spoke with a police officer who told the plaintiff that he would contact the defendant and direct him to cease

---

[1] These emails, which were admitted into evidence at the hearing on the plaintiff's application, were dated March 3, 10, 20, 24, 25 and 27, 2023.

all contact with the plaintiff immediately. The police officer also advised the plaintiff to seek a protective order. Later the same day, the plaintiff received a FedEx courier package at his office. The plaintiff averred that the contents of the package "confirmed [that the defendant] had been stalking [him], as the package contained a letter from [the defendant] listing the address of the Norwalk apartment complex where [the plaintiff had] been hiding."[2] The defendant continued to send emails to the plaintiff's corporate email address on April 7, 10 and 13, 2023. The plaintiff stated in his affidavit that he was "fearful [the defendant] [would] escalate his conduct in order to maintain control over [the plaintiff's] life and finances. [He was] afraid for [his] personal safety, and of losing [his] job. [He] simply [wished] to be left alone at [his] workplace, and in his personal life."

On May 3, 2023, the court, *Hon. Michael E. Shay*, judge trial referee, issued a temporary restraining order ex parte and scheduled a hearing to take place on May 16, 2023. At the hearing, the plaintiff testified in support of his application. After the plaintiff rested, the defendant orally moved for a "directed verdict" on the ground that the plaintiff had not established a prima facie case that he was a victim of domestic violence as defined in General Statutes § 46b-1 (b). Following argument, the court, *Heller, J.* granted the defendant's motion, concluding that the plaintiff had failed to satisfy the requirements of § 46b-15, specifically, that the plaintiff was a victim of domestic violence as defined in § 46b-1 (b). The court found, inter alia, that the plaintiff had not established that the defendant had exercised coercive control over the plaintiff, as required by § 46b-1 (b) (4) or stalked the plaintiff as required by § 46b-1 (b) (2). In its oral decision, the court discharged the temporary restraining order that was entered on an ex

---

[2] This letter, which was dated March 24, 2023, was admitted into evidence at the hearing on the plaintiff's application.

parte basis on May 3, 2023, and denied the plaintiff's application for relief from abuse.[3] Thereafter, on May 16, 2023, the court rendered a judgment of dismissal, pursuant to Practice Book § 14-3, for failure to prosecute the action with reasonable diligence. This appeal followed.

Before addressing the plaintiff's claims on appeal, we address the standard of review applicable to this matter. As previously indicated in this opinion, after the plaintiff rested, the trial court granted the defendant's oral motion for a directed verdict on the ground that the plaintiff had not made out a prima facie case pursuant to § 46b-15, specifically, that the plaintiff was a victim of domestic violence as defined in § 46b-1 (b). Because this case was tried to the court and not a jury, however, the defendant should have moved for a judgment of dismissal pursuant to Practice Book § 15-8, the rule applicable to civil matters tried to the court, rather than for a directed verdict.[4] "[B]ecause the standard for granting a motion for directed verdict is the same as the standard for granting a motion for judgment of dismissal [pursuant to Practice Book § 15-8]"; *Winn* v. *Posades*, 281 Conn. 50, 54 n.1, 913 A.2d 407 (2007); we will treat the defendant's motion for a directed verdict as a motion for a judgment of dismissal for purposes of this appeal.

[3] The trial court also ordered that the parties not make any efforts to contact each other, physically or electronically, and that they communicate with each other through counsel. Although the authority of the court to order such relief under the circumstances of this case is unclear, this portion of the court's order has not been challenged on appeal.

[4] Practice Book § 15-8 provides: "If, on the trial of any issue of fact in a civil matter tried to the court, the plaintiff has produced evidence and rested, a defendant may move for judgment of dismissal, and the judicial authority may grant such motion if the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

"The standard for determining whether the plaintiff has made out a prima facie case, under Practice Book § 15-8, is whether the plaintiff put forth sufficient evidence that, *if believed*, would establish a prima facie case, not whether the trier of fact believes it. . . . For the court to grant the motion [for judgment of dismissal pursuant to Practice Book § 15-8], it must be of the opinion that the plaintiff has failed to make out a prima facie case. In testing the sufficiency of the evidence, the court compares the evidence with the allegations of the complaint. . . . In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . [T]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor. . . . Whether the plaintiff has established a prima facie case is a question of law, over which our review is plenary." (Citation omitted, emphasis in original; internal quotation marks omitted.) *Charter Oak Lending Group, LLC* v. *August*, 127 Conn. App. 428, 434–35,14 A.3d 449, cert. denied, 302 Conn. 901, 23 A.3d 1241 (2011).[5]

I

On appeal, the plaintiff claims that the trial court improperly concluded that the defendant was not exercising coercive control over him, pursuant to § 46b-1

---

[5] Similarly, "[w]hether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary. . . . Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff. . . . Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Citation omitted; internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 855–56, 37 A.3d 700 (2012).

(b) (4), or stalking him, pursuant to § 46b-1 (b) (2).[6] Our analysis of this claim requires a review of the trial court's decision in light of §§ 46b-15 and 46b-1 (b), the applicable statutory provisions.

Section 46b-15 (a) provides in relevant part that "[a]ny family or household member, as defined in section 46b-38a,[7] who is the victim of domestic violence, as defined in section 46b-1, by another family or household member may make an application to the Superior Court for relief under this section. . . ." (Footnote added.) Section 46b-1 (b) defines "domestic violence" as "(1) A continuous threat of present physical pain or physical injury against a family or household member, as defined in section 46b-38a; (2) stalking, including, but not limited to, stalking as defined in section 53a-181d, of such family or household member; (3) a pattern of threatening, including, but not limited to, a pattern of threatening as described in section 53a-62, of such family or household member or a third party that intimidates such family or household member; or (4) coercive control of such family or household member, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." Section 46b-1 (b) (4) then provides a list of examples of conduct that are included within the definition of "coercive control."[8]

---

[6] The plaintiff contends that the trial court's findings in this regard were clearly erroneous. Whether the plaintiff has established a prima facie case, however, is a question of law, over which our review is plenary. *Charter Oak Lending Group, LLC* v. *August*, supra, 127 Conn. App. 434–35.

[7] Because the plaintiff and the defendant previously had resided together, the trial court found that they were "family or household member[s]" within the definition of General Statutes § 46b-38a (2). This finding has not been challenged on appeal.

[8] General Statutes § 46b-1 (b) (4) provides in relevant part that " 'Coercive control' includes, but is not limited to, unreasonably engaging in any of the following:

"(A) Isolating the family or household member from friends, relatives or other sources of support;

"(B) Depriving the family or household member of basic necessities;

"(C) Controlling, regulating or monitoring the family or household mem-

## A

## Coercive Control

We first consider whether the trial court improperly concluded that the defendant had not exercised coercive control over the plaintiff pursuant to § 46b-1 (b) (4). As to this claim, the plaintiff first contends that the trial court improperly limited the definition of "coercive control" in § 46b-1 (b) (4) to the examples set forth in the statute without applying the complete definition of that term specified in the same statute. Applying the broader definition of "coercive control," the plaintiff contends that the evidence demonstrated "a pattern of behavior [by the defendant] that in purpose or effect unreasonably interferes with a person's free will and personal liberty," and, thus, established "coercive control" pursuant to § 46b-1 (b). The resolution of the plaintiff's claim requires that we first consider, as a matter of statutory interpretation, whether the court improperly limited its consideration of "coercive control" to the examples set forth in § 46b-1 (b) (4).

"To the extent that the [plaintiff's] claims raise issues of statutory interpretation, we note that [i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned

ber's movements, communications, daily behavior, finances, economic resources or access to services;

"(D) Compelling the family or household member by force, threat or intimidation, including, but not limited to, threats based on actual or suspected immigration status, to (i) to engage in conduct from which such family or household member has a right to abstain, or (ii) abstain from conduct that such family or household member has a right to pursue;

"(E) Committing or threatening to commit cruelty to animals that intimidates the family or household member; or

"(F) Forced sex acts, or threats of a sexual nature, including but not limited to, threatened acts of sexual conduct, threats based on a person's sexuality or threats to release sexual images."

manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . General Statutes § 1-2z directs this court to first consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning is plain and unambiguous and does not yield absurd or unworkable results, we shall not consider extratextual evidence of the meaning of the statute. . . . Only if we determine that the statute is not plain and unambiguous or yields absurd or unworkable results may we consider extratextual evidence of its meaning such as the legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement . . . its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *L. L.* v. *M. B.*, 216 Conn. App. 731, 739–40, 286 A.3d 489 (2022).

As previously set forth in this opinion, § 46b-1 (b) (4) defines "coercive control" as "a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty. 'Coercive control' includes, but is not limited to, unreasonably engaging" in any of the examples set forth in subparagraphs (A) though (F) of the statute. See footnote 8 of this opinion. In its decision, the trial court considered *only* the examples set forth in the statute and concluded that the plaintiff had not established coercive control; however, the court did not consider the broader definition of the term, namely, whether the defendant had "in purpose or effect unreasonably interfere[d] with [the plaintiff's] free will and personal liberty."[9] We note,

[9] Specifically, the court stated:

"As far as coercive control, that is a new element of the statute as counsel knows. And coercive control is defined in § 46b-1, and we are starting in [sub]section (B) and then going through sub[paragraphs] (A) through (F), the statute says coercive control includes but is not limited to unreasonably engaging in any of the following:

however, that "the phrase [including but not limited to in § 46b-1 (b) (4)] convey[s] a clear intention that the items listed in the definition do not constitute an exhaustive or exclusive list." (Internal quotation marks omitted.) *Lusa* v. *Grunberg*, 101 Conn. App. 739, 756, 923 A.2d 795 (2007); see also *Casey* v. *Lamont*, 338

"(A), isolating the family or household member from friends, relatives, or other sources of support. Now [the plaintiff] testified that he had no family here, so by reason of the fact he is living in the United States, and he testified that he's originally from Peru, he has no family members here.

"But there is no evidence that [the defendant] isolated [the plaintiff] from his friends, relatives, or sources of support.

"(B) is depriving family or a household member of basic necessities. There is no evidence of that.

"(C), controlling, regulating, and monitoring the family or household member's movements, communications, daily behavior, finances, economic resources, or access to services.

"[The plaintiff] testified that he was the victim of identity theft, that [the defendant] had opened an account in his name under his Social Security number that he was not aware of, but that does not fall within the statutory definition of coercive control.

"It may well raise a whole host of other issues, but it doesn't satisfy the definition of coercive control and does not demonstrate that [the defendant] was controlling, regulating, and monitoring [the plaintiff's] movements, communications, daily behavior, finances, economic resources, or access to services.

"Sub[paragraph] (D) states that coercive control can be compelling the family or household member by force, threat or intimidation, including but not limited to threats based on actual or suspected immigration status, to, one, engage in conduct from which such family or household member has a right to abstain or, two, abstain from conduct that such family or household member has a right to pursue.

"There is no evidence that sub[paragraph] (D) of the statutory definition has been satisfied.

"Sub[paragraph] [E] indicates that coercive control may mean committing or threatening to commit cruelty to animals that intimidates a family or household member.

"There was no evidence of any acts or threats to commit cruelty to animals.

"And the last sub[paragraph], (F), forced sex acts or threats of a sexual nature, including but not limited to threatened acts of sexual conduct, threats based on a person's sexuality, or threats to release sexual images.

"Again, there was no evidence of any forced sexual acts or threatened acts of sexual conduct, threats based on a person's sexuality or threats to release sexual images here.

"So, the definition of coercive control has . . . not been satisfied."

Conn. 479, 491, 258 A.3d 647 (2021) (concluding, in context of COVID-19 executive orders, that statutory list preceded by phrase "including but not limited to" evinces legislative intent not to limit scope of statute to events enumerated in statute).

Consequently, we conclude that the language of the statute is clear and unambiguous in that the plaintiff did not need to prove that the defendant's conduct met one of the examples set forth in § 46b-1 (b) (4) to establish coercive control. Instead, he needed to prove only that the defendant's conduct constituted "a pattern of behavior that in purpose or effect unreasonably interfere[d] with [the plaintiff's] free will and personal liberty." General Statutes § 46b-1 (b) (4).

Because our review of a court's dismissal under Practice Book § 15-8 is plenary, we next consider whether, applying the more expansive definition of coercive control, the plaintiff had established a prima facie case that the defendant engaged in conduct violative of § 46b-1 (b) (4). Specifically, considering the evidence in the light most favorable to the plaintiff, and drawing every reasonable inference in the plaintiff's favor, we consider whether the plaintiff established a prima facie case that the defendant had "in purpose or effect unreasonably interfere[d] with [the plaintiff's] free will and personal liberty." Applying this definition, we conclude that the plaintiff failed to establish a prima facie case of coercive control as set forth in § 46b-1 (b) (4).

The following additional facts are necessary for the resolution of this claim. At the hearing on the application, the plaintiff expanded on the claims made in his application and supporting affidavit. Specifically, he testified about the money that the defendant took out of the plaintiff's bank accounts and the accounts that the defendant opened in the plaintiff's name. He testified that he had limited ability to invite others to the parties'

residence because the defendant was not comfortable receiving guests in the home. He testified that he continued living in the parties' residence with the defendant after the parties' domestic partnership ended in 2019 "because . . . that was [his] home" and he "couldn't go anywhere."[10]

The plaintiff also testified in more detail regarding the emails, attachments thereto, and the FedEx package mentioned in his affidavit filed in support of his ex parte application. Specifically, the plaintiff testified that, on February 27, 2023, the defendant sent him an email at work, the subject of which was "FRAUDULENT 1099 NEC." Attached to the email was an IRS Form 1099-NEC (Form 1099-NEC) which reported that the plaintiff had paid the defendant nonemployee compensation during calendar year 2022 in the amount of $85,994.58. On March 3, 2023, after the plaintiff's attorney told the defendant's attorney that the defendant was not to contact the plaintiff at his workplace, the defendant sent a second email to the plaintiff's workplace regarding the Form 1099-NEC. On March 10, 2023, the defendant sent a third email regarding the same subject to the plaintiff's work email. On March 27, 2023, the plaintiff received the FedEx package at work, which contained the same correspondence as was in the earlier emails regarding "FRAUDULENT 1099 NEC."

In the emails and the correspondence in the FedEx package regarding this form, the defendant repeatedly asked the plaintiff to "provide a detailed summary for services rendered regarding the Form 1099 NEC issued to [the defendant] by [the plaintiff] in the amount of $85,994.58." The plaintiff testified that he issued the

---

[10] The plaintiff contends that this "forced cohabitation" was the result of the defendant's refusal to sell the property. The plaintiff's affidavit in support of his application for a domestic relations restraining order, however, indicates that he commenced an action to force a sale of the property in June, 2022.

Form 1099-NEC to the defendant upon advice from an accountant and in response to the claimed fraudulent activity of the defendant involving the plaintiff's financial accounts. The plaintiff further testified, however, that he did not inform the defendant that he was going to issue the Form 1099-NEC to him. Nor was there any evidence that the plaintiff ever responded to the defendant's requests for information regarding the form.

The plaintiff also testified about emails the defendant sent to him at work regarding the parties' jointly owned residence that the plaintiff left at the end of January, 2023. He testified that, on March 20, 24, 25 and 27, 2023, and on April 7, 10 and 13, 2023, the defendant sent emails to the plaintiff at work regarding judgment liens that had been placed on the residence and the fact that the mortgage on the residence had not been paid. Attached to these emails were copies of the liens and correspondence from the mortgage lender. The plaintiff testified that he did not respond to any of the emails about the mortgage and judgment liens with a request that the defendant communicate with him using a different email address. The plaintiff testified that he had been paying the mortgage on the residence until December, 2022, one month prior to moving out. The plaintiff testified that he continued to receive rental income from the property after he moved out at the end of January, 2023. Under these circumstances, the plaintiff acknowledged that the defendant would want him to continue to pay the mortgage. He testified, however, that he could not afford to do so as he had to pay rent on his new residence.

The plaintiff contends that the evidence he provided, viewed in the light most favorable to him, meets the statutory definition of coercive control. In making this

argument, he relies on comments made by various legis-lators when § 46b-1 was amended in 2021.[11] Specifically, the plaintiff relies, in part, on the comment of Senator Kasser that, "as dangerous as it is to be in an abusive relationship, [*it is*] *even more dangerous to leave*"; 64 S. Proc., Pt. 3, 2021 Sess., p. 2087, remarks of Senator Alexandra Kasser; and the comment of Senator Kelly that the legislation "[gives] victims the tools they need to protect themselves, to stand up for themselves, *and to get out of bad situations*." (Emphasis added.) Id., p. 2136, remarks of Senator Kevin C. Kelly. In the present case, however, the relationship between the parties had already ended and the plaintiff had moved out of the parties' residence when he filed the application for a domestic violence restraining order. Specifically, the plaintiff testified that he had moved out of the parties' residence in January, 2023. The application for a domes-tic violence restraining order was filed on May 3, 2023. Furthermore, the emails that the defendant sent to the plaintiff's corporate email address commenced on Feb-ruary 27, 2023, after the plaintiff had vacated the parties' residence.

Under these circumstances, even if the defendant's actions while the parties were living together consti-tuted "coercive control" within the meaning of § 46b-1 (b) (4), any coercive control contemplated by the

---

[11] In 2021, § 46b-1 (b) was amended to include the definition of "domestic violence." Public Acts 2021, No. 21-78, § 1. During the discussion regarding the proposed legislation, Representative Stafstrom pointed out that the legis-lation expanded the definition of domestic violence to include coercive control, which he described as "a pattern of threatening, humiliating, intim-idating, or exploiting actions used to harm, punish, or frighten a person and deprive them of their freedom, autonomy, and basic human rights." 64 H.R. Proc., Pt. 14, 2021 Sess., p. 9756, remarks of Representative Steven J. Stafstrom. Senator Kelly similarly remarked that domestic violence is "about power and control that goes beyond a single act of violence" and "includes emotional and psychological abuse, intimidation, and isolation." 64 S. Proc., Pt. 3, 2021 Sess., p. 2135, remarks of Senator Kevin C. Kelly. Senator Kasser, speaking about the "public health crisis" of domestic violence, stated that "[ninety percent] of domestic abuse is not violent. It's psychological, finan-

statute had ended by the time the plaintiff filed the application for a domestic violence restraining order. Put another way, the plaintiff had managed to leave the bad situation in which he was living months before he filed his application. Although it is true that the parties were still in dispute over financial issues that arose during their relationship and after it ended, the evidence presented in support of those issues does not demonstrate that the defendant exercised coercive control of the plaintiff as defined by the statute. To the contrary, the undisputed evidence is that the defendant's communications that are the basis for the plaintiff's application were sent in response to decisions made and actions taken by the plaintiff that negatively impacted the defendant's finances. Although the plaintiff may have had every right to undertake such actions, the defendant's requests for information regarding the plaintiff's actions do not constitute coercive control under § 46b-1 (b) (4).[12] Considering the evidence in the light most favorable to the plaintiff, and drawing every reasonable inference in the plaintiff's favor; *Charter Oak Lending Group, LLC* v. *August*, supra, 127 Conn. App. 434–35; we conclude that the plaintiff failed to establish a prima facie case that the defendant had "in purpose or effect unreasonably interfere[d] with [the plaintiff's] free will and personal liberty" as required by § 46b-1 (b) (4).

## B

### Stalking

We next consider whether the trial court improperly concluded that the plaintiff had failed to establish a prima facie case that the defendant had stalked the

cial, sexual, and legal, because those methods are even more effective at controlling a person and diminishing [his or] her agency and ability to leave." Id., pp. 2086–2088, remarks of Senator Alexandra Kasser.

[12] In reaching this conclusion, we in no way suggest any view as to the plaintiff's allegations of the defendant's actions regarding the defendant's manipulation of the plaintiff's finances.

plaintiff pursuant to § 46b-1 (b) (2). As to this claim, the plaintiff contends that the emails the defendant sent to the plaintiff's corporate email address and the FedEx package that was delivered to the plaintiff's place of business establish that the defendant had stalked the plaintiff as contemplated by § 46b-1 (b) (2). We are not persuaded.

Section 46b-1 (b) (2) provides that domestic violence means "stalking, including, but not limited to, stalking as described in section 53a-181d, of such family or household member . . . ." In its oral decision, the court focused on § 53a-181d (b) (2), which provides that "[a] person is guilty of stalking in the second degree when . . . [s]uch person with intent to harass, terrorize or alarm, and for no legitimate purpose, engages in a course of conduct directed at or concerning a specific person that would cause a reasonable person to fear that such person's employment, business or career is threatened, where (A) such conduct consists of the actor telephoning to, appearing at or initiating communication or contact to such other person's place of employment or business, including electronically, through video-teleconferencing or by digital media, provided the actor was previously and clearly informed to cease such conduct, and (B) such conduct does not consist of constitutionally protected activity . . . ."

As to this subparagraph, the plaintiff's claim focuses on the emails that the defendant sent to the plaintiff's corporate email address after being told by the plaintiff's attorney that all such communications should be directed to that attorney. As set forth earlier in this opinion, these emails contained attachments including a Form 1099-NEC that the plaintiff had issued to the defendant as well as copies of judgment liens, mortgage statements, and overdue notices pertaining to the parties' property. The plaintiff further argues that the FedEx package that the defendant sent to the plaintiff's

place of business that contained the plaintiff's new home address proved that the defendant was stalking him as defined in the statute. In particular, the plaintiff testified that he was concerned that these emails and the package sent to his office would have an impact on his job and that the package evidenced that the defendant had managed to discover the plaintiff's new home address, which he had taken steps to prevent the defendant from learning.[13]

As previously stated in this opinion, the plaintiff acknowledged that he did not respond to any of the defendant's emails with a request that the defendant send communications to the plaintiff using a different email address. He testified that he had stopped paying the mortgage on the property as he could not afford it once he moved out because he had to pay rent. He also testified that he had not informed the defendant that he was going to issue a Form 1099-NEC to him.

In its oral decision, the trial court found that the defendant contacted the plaintiff at his place of employment after being told not to do so and noted the plaintiff's testimony that this caused the plaintiff to fear for his employment. The court concluded, however, that the plaintiff had not sustained his burden of establishing that the defendant did so with the intent to harass, terrorize or alarm, and for no legitimate purpose. Specifically, the court found that the emails contained attachments such as judgment liens or communications from a mortgage company relating to the home the parties

---

[13] As part of this claim, the plaintiff contends that these communications must be evaluated on the basis of the context and surrounding circumstances between the parties and that "an order of protection is routinely appropriate where a defendant fails to refute or offer any explanation for their actions." To the extent the plaintiff's argument challenges the defendant's failure to offer an explanation for his actions, we note that the plaintiff did not call the defendant to testify as a witness during his case-in-chief and the trial court granted the defendant's motion to dismiss for failure to make out a prima facie case, thus alleviating the defendant's need to testify.

jointly owned, and that nothing in the attached documents was threatening. The court further noted that, because the plaintiff had an ownership interest in the property and had been paying the mortgage, the defendant had a legitimate purpose for forwarding the documents to the plaintiff. The court noted that the communications "related to the property for which [the plaintiff] was paying the mortgage and they [related] to a 1099 that was apparently issued."[14]

On the basis of our review of the testimony and exhibits in this case, we agree with the trial court that the emails and attached documents were not sent to the

[14] As to this section of the statute, the trial court's oral decision provides: "[N]otice was provided, as [the plaintiff] testified, to [the defendant] to not contact him and the contact did consist of [the defendant] contacting [the plaintiff] at his place of employment.

"And [the plaintiff] testified that he felt that the nature of the emails and the material that was sent did cause him to fear that his employment was threatened.

"But when we go to the very first clause that says such person with intent to harass, terrorize or alarm and for no legitimate purpose engages in a course of conduct, it's at that point where I think [the plaintiff] has not sustained his burden of proof.

"I have reviewed the emails as they were introduced into evidence. Most of them are emails transmitting documents.

"The attachments are communications from third parties that consist either of judgment liens that have been placed on the land records of the city of Stamford, liens against the title of the real property . . . or communications from the mortgage company.

"Nothing in those documents that are attached are in the nature of threatening documents. You know, certainly somebody would [not] be happy or [would be] alarmed or distressed to learn that their property is in foreclosure or that there are mortgage liens or judgment liens against the property, but transmitting those documents, given the fact that [the] . . . documents are not fabrications, they are—you know, appear to be as they are on their face communications from the mortgage company and certificates of judgment liens.

"There is nothing intrinsically harassing, terrorizing or alarming about those documents. And in transmittal emails sending those to [the plaintiff], I do not consider [rising] to the level of being sent with an intent to harass, terrorize or alarm.

"In fact . . . [the plaintiff] has an ownership interest in the property and was paying the mortgage, so these are documents that most definitely if [the plaintiff] has not received them, would be—it would be appropriate for [the defendant] to forward them to him."

plaintiff with the intent to harass, terrorize or alarm, and for no legitimate purpose. The emails that transmitted judgment liens or other mortgage related documents from third parties to the plaintiff contained no text from the defendant to the plaintiff. As to the emails labeled "FRAUDULENT 1099 NEC," the plaintiff admitted that he did not inform the defendant that he was going to issue a Form 1099-NEC to him. It is not surprising that the defendant would want an explanation regarding the nonemployee compensation stated on that form in the amount of $85,994.58. The FedEx package that was sent to the plaintiff at work indicated that it was the "Final Request" as to the Form 1099-NEC. The plaintiff acknowledged that he had not responded to any of the prior emails with a request that the defendant direct the emails to a different email address. Thus, there was a legitimate purpose for all of the defendant's communications. Considering the evidence in the light most favorable to the plaintiff and drawing every reasonable inference in the plaintiff's favor; *Charter Oak Lending Group, LLC* v. *August*, supra, 127 Conn. App. 424–35; the trial court properly concluded that the plaintiff had failed to establish a prima facie case that the defendant had stalked the plaintiff pursuant to § 46b-1 (b) (2).[15]

[15] The court also concluded that the plaintiff had not established a prima facie case of stalking pursuant to § 53a-181d (b) (1), which provides that "[a] person is guilty of stalking in the second degree when . . . [s]uch person knowingly engages in a course of conduct directed at or concerning a specific person that would cause a reasonable person to (A) fear for such person's physical safety or the physical safety of a third person; (B) suffer emotional distress; or (C) fear injury to or the death of an animal owned by or in possession and control of such specific person . . . ." General Statutes § 53a-181d (b) (1). The plaintiff provides only a cursory analysis regarding the application of this subdivision of the statute to the facts of this case, simply indicating that he testified regarding subparagraphs (A) and (B). In light of our conclusion that there was a legitimate purpose for the defendant's communications, which consisted primarily of emails and attachments related to the property for which the plaintiff had been paying the mortgage and a Form 1099-NEC that the plaintiff had issued to the defendant, we similarly agree with the trial court that the plaintiff had not established a prima facie case of stalking pursuant to § 53a-181d (b) (1).

## II

The plaintiff next claims that he was denied his federal and state constitutional right to equal protection when he was treated differently than similarly situated heterosexual or female victims. According to the plaintiff, case law establishes that heterosexual or female victims fleeing an aggressor under far less egregious facts have regularly been granted an order of protection. The plaintiff cites *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001), for the proposition that "[a] violation of equal protection by selective [treatment] arises if: (1) the person, compared with others similarly situated, was selectively treated; and . . . (2) such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injury a person." (Internal quotation marks omitted.) Id., 671.

In response, the defendant contends that the plaintiff did not raise this claim before the trial court and his claim does not survive review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel*, 317 Conn. 773, 781, 120 A.3d 1188 (2015),[16] because, "[i]n the instant case, there is

The court further noted that § 53a-181d (b) (3), which involves the disclosure of an individual's personal identifying information without consent, was not at issue in this case.

[16] Pursuant to *Golding*, "a [party] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [party] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel*, supra, 317 Conn. 781 (modifying third prong of *Golding*). "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional

no evidence of a lack of equal protection or bias on the part of the court or that the plaintiff was denied a fair trial. Additionally, the cases [the plaintiff] cites are not analogous to the instant case and therefore offer no support for the plaintiff's claims of a lack of equal protection thus [the plaintiff's] claim should fail." Essentially, the defendant argues that the plaintiff cannot satisfy *Golding*'s third prong of establishing the existence of the alleged constitutional violation. We agree.[17]

The crux of the plaintiff's equal protection claim is that the plaintiff, who is an immigrant, a minority, and a member of the LGBTQ community, is a member of a quasi-suspect class and was selectively treated based on impermissible considerations. Specifically, the plaintiff contends that no similarly situated heterosexual person would have been denied an order of protection had they presented the same uncontested testimony and evidence. The plaintiff states that he is "unaware of any case where any female or heterosexual applicant has been denied a protective order based on such a troubling or egregious [claim], particularly where no contrary explanation was even offered by a defendant."[18]

The plaintiff relies on cases in which orders of protection were granted to heterosexual female complainants

---

error requiring a new trial." (Internal quotation marks omitted.) *In re Na-Ki J.*, 222 Conn. App. 1, 7, 303 A.3d 1206, cert. denied, 348 Conn. 929, 304 A.3d 860 (2023). "*Golding* is applicable in civil cases as well as criminal cases." *Hammer* v. *Posta*, 170 Conn. App. 701, 707 n.6, 155 A.3d 801 (2017).

[17] "We are free to respond to the [plaintiff's] claim by focusing on whichever *Golding* prong is most relevant, as the inability to meet any one prong requires a determination that the [plaintiff's] claim must fail." (Internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, 226 Conn. App. 617, 634, 319 A.3d 242, cert. denied, 350 Conn. 912, 324 A.3d 143 (2024).

[18] As set forth earlier in this opinion, the plaintiff did not call the defendant to testify as a witness during his case-in-chief and, after the plaintiff rested, the trial court granted the defendant's motion for a directed verdict for failure to make out a prima facie case.

as support for his claim that he was denied equal protection; these cases, however, are readily distinguishable from the present case. For example, we do not agree with the plaintiff that the fact pattern in *Tala E. H.* v. *Syed I.*, 183 Conn. App. 224, 192 A.3d 494 (2018), cert. denied, 330 Conn. 959, 199 A.3d 19 (2019), "closely parallels the instant appeal." In *Tala E. H.*, this court affirmed the judgment of the trial court extending an order of protection against the defendant for six months, noting that the defendant "acknowledged that he 'badgered' the plaintiff with text messages and that he was controlling. He admitted that he went to her workplace and gave her a handwritten message, tracked her when she was operating his motor vehicle, used surveillance cameras to observe her comings and goings, and visited her friends and family to ascertain information about her."[19] Id., 242. Similarly, in *Kathrynne S.* v. *Swetz*, 191 Conn. App. 850, 852–53, 216 A.3d 858 (2019), this court affirmed the judgment of the trial court granting the plaintiff's application for relief from abuse and issuing a domestic violence restraining order where the plaintiff averred "that the defendant screamed in her left ear, verbally attacked her so forcefully that she would be covered in his spit, followed her throughout the house, opened windows on cold days, used derogatory language directed at her, threatened to sabotage her car, and barged into her room to take photographs of her in her nightwear, and that the defendant had been arrested for assaulting her in 2015." In sum, the facts in the cases cited by the defendant are in no way similar to the facts in the present case, which involved written communications from the defendant that either forwarded information to the

---

[19] The defendant in *Tala E. H.* v. *Syed I.*, supra, 183 Conn. 232, claimed, inter alia, that the manner in which the court conducted the hearing on the continuance of the protective order constituted judicial misconduct and bias. This court reviewed the claim under the plain error doctrine, but found no evidence of bias, misconduct or impartiality in the record. Id., 233.

plaintiff about the property they jointly owned or asked the plaintiff to explain the basis for the Form 1099-NEC he had issued to the defendant. The evidence in the present case reflects none of the threatening or controlling behavior at issue in the cases on which the plaintiff relies. Consequently, the fact that the plaintiff did not prevail in the present case, while the applicants prevailed in those cases, in no way reflects that he was denied his right to equal protection.[20]

Moreover, the plaintiff has presented no basis for us to conclude that the trial court treated him differently than any other applicant for a domestic violence restraining order and, therefore, denied him equal protection. His appellate briefs cite no evidence of discrimination or bias by the trial court, and our independent review of the transcript of the hearing on the plaintiff's application does not reveal even a scintilla of evidence of discrimination or bias. During oral argument before this court, the plaintiff was unable to point to a single statement in the record supporting his contention that he had been denied his federal and state right to equal protection.

Instead, the plaintiff's argument is that, because it is so clear that his application should have been granted, the only conceivable reason for its denial is the illegal bias of the trial court. We have regularly rejected similar claims of bias, noting that dissatisfaction with the outcome of a proceeding is insufficient to support a claim

---

[20] The defendant also cites *K. D.* v. *D. D.*, 214 Conn. App. 821, 282 A.3d 528 (2022), as another example in which an order of protection was found to be appropriate. In that case, however, this court reversed the judgment of the trial court granting the plaintiff's application for a civil restraining order because the trial court had applied an incorrect legal standard when it determined that the defendant had subjected the plaintiff to a pattern of threatening. Id., 823. Specifically, the trial court in that case erred in failing to apply an objective standard to its determination when it issued a civil restraining order based on the "pattern of threatening" provision in § 46b-15. Id., 826–27.

of judicial bias. See, e.g., *Schimenti* v. *Schimenti*, 181 Conn. App. 385, 395, 186 A.3d 739 (2018) ("[i]n assessing a claim of judicial bias, we are mindful that adverse rulings, alone, provide an insufficient basis for finding bias even when those rulings may be erroneous") Simply put, the record is devoid of any evidence that the trial court had selectively treated the plaintiff for impermissible reasons, and the outcome of other cases involving different facts does not suggest otherwise. Under these circumstances, the plaintiff has not established that a constitutional violation existed.

III

The plaintiff's final claim is that the trial court improperly dismissed this case for failure to diligently prosecute pursuant to Practice Book § 14-3. We agree with the plaintiff that the form of the judgment is improper.

As stated earlier in this opinion, the trial court, in its decision, granted the defendant's motion for a directed verdict, concluding that the plaintiff had failed to satisfy the requirements of § 46b-15. The court thereafter discharged the temporary restraining order that was entered on an ex parte basis on May 3, 2023, and denied the plaintiff's application for relief from abuse. On May 16, 2023, the court rendered a judgment of dismissal, pursuant to Practice Book § 14-3, for failure to prosecute the action with reasonable diligence. As previously set forth in this opinion, however, because this case was tried to the court and not a jury, the defendant should have moved for a judgment of dismissal pursuant to Practice Book § 15-8, the rule applicable to civil matters tried to the court. In part I of this opinion, we treated the defendant's motion for a directed verdict as a motion for a judgment of dismissal pursuant to Practice Book § 15-8 and concluded that the plaintiff had failed to establish a prima facie case that he was

a victim of domestic violence as defined in § 46b-1 (b). The judgment, therefore, should reflect that the trial court properly dismissed this case pursuant to Practice Book § 15-8 and not that the case was dismissed pursuant to Practice Book § 14-3 for failure to prosecute with reasonable diligence.

The form of the judgment is improper, the judgment is reversed and the case is remanded with direction to render judgment of dismissal pursuant to Practice Book § 15-8.

In this opinion the other judges concurred.